**In re LANDAU BOAT COMPANY, Debtor.**

**Bankruptcy No. 80–00716–S–11.**

United States Bankruptcy Court, W. D. Missouri, S. D.

Jan. 9, 1981.

See also Bkrtcy., 8 B.R. 436.

Gary A. Love, Springfield, Mo., for debtor.

Gary Nelms, Springfield, Mo., and Fred E. Arnold, St. Louis, Mo., for Reynolds Metals Co.

Joe C. Greene, Springfield, Mo., for Bass Pro Shops.

## MEMORANDUM OPINION AND ORDER

JOEL PELOFSKY, Bankruptcy Judge.

In this Chapter 11 proceeding, the solicitation of acceptances of the Plan has been

completed and the Plan has been rejected by creditors holding a majority in amount of the claims. Subsequently, debtor moved the Court to find that the rejection of the Plan by creditor Reynolds Metals Company was not in good faith, pursuant to the provisions of Section 1126(e), Title 11, U.S.C., and that the rejection should be ignored in determining whether the Plan should be confirmed. If the Reynolds' rejection is not considered, the Plan will have been accepted by the required number of creditors and may be confirmed, if other statutory requirements are met.

The debtor suggests that the Reynolds' rejection was not in good faith for two reasons. One is that the Plan proposes a payment of 10% on each unsecured claim, liquidation would give unsecured creditors nothing and rejection of the Plan, therefore, makes no economic sense. The other is that debtor and Reynolds are engaged in litigation, including an anti-trust claim made by debtor. If debtor were proceeding in liquidation rather than reorganization, this litigation would be directed by the trustee in bankruptcy rather than debtor's officers. Debtor argues that the trustee would have less incentive to pursue the litigation than would debtor's officers and that witnesses might be lost if the corporation were liquidated.

A hearing was held on the Motion on November 21, 1980. Debtor and Reynolds appeared by counsel. Evidence was heard. Stipulations prepared by counsel were also introduced. Counsel made argument and the matter was taken under advisement, pending receipt of the transcript which was filed December 22, 1980.

Section 1126 establishes criteria for acceptance or rejection of a plan of reorganization. The statute provides, in part, that

"(a) The holder of a claim or interest allowed under section 502 of this title may accept or reject a plan ...

(c) A class of claims has accepted a plan if such plan has been accepted by creditors, other than any entity designated under subsection (e) of this section, ...

(e) On request of a party in interest, and after notice and a hearing, the court may designate any entity whose acceptance or rejection of such plan was not in good faith ..."

The predecessor of Section 1126(e) was Section 203 of the Bankruptcy Act, Section 603, Title 11, U.S.C. That section provided that "If the acceptance or failure to accept a plan by the holder of any claim or stock is not in good faith, in the light of or irrespective of the time of acquisition thereof, the judge may, after hearing upon notice, direct that such claim or stock be disqualified for the purpose of determining the requisite majority for the acceptance of a plan." Bankruptcy Rule 10–305(d) mirrored the language of the statute.

Prior to the enactment of this statute, there had been instances where creditors had been able to manipulate a plan of reorganization to favor a few by purchasing claims for less than face value or during the course of the voting or where a debtor in possession favored one creditor's proposed reorganization over another. See *Security First National Bank v. Rindge Land & Navigation Co.*, 85 F.2d 557 (9th Cir. 1936) and *In re Lorraine Castle Apartment Bldg. Corp.*, 149 F.2d 55 (7th Cir. 1945). Courts seemed to suggest that conduct short of fraud was permissible even though such conduct might discriminate in favor of a few creditors. *Texas Hotel Corporation v. Waco Development Co.*, 87 F.2d 395 (5th Cir. 1936).

Questions as to conduct of creditors or those buying claims were settled by the Supreme Court in *Young v. Higbee Co.*, 324 U.S. 204, 65 S.Ct. 594, 89 L.Ed. 890 (1945). In that case, two stockholders objected to confirmation of a plan of reorganization on the ground that the plan favored a junior indebtedness purchased by two directors. The stockholders then sold their stock and their appeal to the directors for a sum greatly in excess of the par or market values of the stock. Another stockholder attempted to intervene to preserve the appeal but intervention was denied and the appeal dismissed. An attempt to compel an

accounting from the two selling stockholders was denied by the trial court.

The Supreme Court found that since the appeal affected the rights of all preferred stockholders, it was a class appeal and not merely of the two individuals. The statute gave members of a class no right to sell their appeal to the disadvantage of other members of the class. "One of the prime purposes of the bankruptcy law has been to bring about a ratable distribution among creditors of a bankrupt's assets; to protect the creditors from one another. And the corporate reorganization statutes look to a ratable distribution of assets among classes of stockholders as well as creditors. There would be no ratable distribution of this bankrupt estate if Potts and Boag could utilize their statutory right of appeal to get for their preferred stock $7.00 for every $1.00 paid to other preferred stockholders." 324 U.S. at 210, 65 S.Ct. at 597-598.

The Court went on to declare that these two stockholders owed their class the obligation to perform in good faith, comparing the appeal to a vote considered under Section 203. "If Potts and Boag had declined to accept this plan in bad faith, the court, under Section 203 could have denied them the right to vote on the plan at all. The history of this provision makes clear that it was intended to apply to those stockholders whose selfish purpose was to obstruct a fair and feasible reorganization in the hope that someone would pay them more than the ratable equivalent of their proportionate part of the bankrupt's assets." 324 U.S. at 210–211, 65 S.Ct. at 598. The denial of relief below was reversed.

Collier quotes the testimony of SEC Commissioner (later Justice) Douglas to the effect that Section 203 was intended to prevent creditors from the "use of obstructive tactics and of hold-up techniques [to] exact for themselves undue advantages" through acceptance or refusal to accept a plan or to secure "some particular preferential treatment ... for the price of their vote." 6 Collier on Bankruptcy ¶ 9.21 at 1674 (14th Ed.). Self interest is not necessarily, however, bad faith. "The test, then, seems to be whether or not those sought to be disqualified have some "ulterior" reason for their action which looks to some special advantage or increment to be gained thereby." 6 Collier on Bankruptcy, ¶ 9.21 at 1676 (14th Ed.).

Reynolds and the debtor have been engaged in litigation since April of 1979 when Reynolds filed suit in the United States District Court for the Western District of Missouri on open account against debtor. The amount sued for was $248,512.85. An answer and counterclaim grounded in antitrust were filed in November of 1979. The bankruptcy proceeding was filed in March of 1980. The civil action remains in the District Court but this Court takes judicial notice of the files and pleadings of that action.

At the time of the Indemnity Hearing, the Court discussed the formation of a creditors' committee. Reynolds was reluctant to join because of the litigation but did so at the Court's request. The Court was of the opinion that the largest unsecured creditor, Reynolds, should be on the creditors' committee. The Court also gave tentative approval to debtor's disclosure statement and directed its distribution, along with copies of the proposed plan, to creditors. A hearing on the statement and the plan was set for August 8, 1980.

The creditors' committee actively investigated the conduct of debtor's business. On August 8, 1980, at the hearing on confirmation, the committee filed a motion requesting the appointment of an appraiser and also filed objections to the disclosure statement and plan. In its objections to the disclosure statement, the creditors' committee noted that a pre-bankruptcy financial statement acknowledged a misappropriation which had not been corrected. The creditors' committee also called for disclosure of any failure to collect preferences and for identification of the source of new funds necessary to pay the unsecured creditors. The committee objected to confirmation of the plan on the ground that acceptances were solicited before notice and hearing on the disclosure statement. Reynolds filed

separate objections to confirmation by reason of its classification and because it appeared that liquidation might produce more for the unsecured creditors. A hearing was held on all these matters on August 8, 1980.

At that hearing, debtor announced that an audit had begun on August 4, 1980, which would be completed in September or October. While stating that debtor had a commitment of funds for the reorganization, debtor did not identify the investors. The creditors' committee announced that it could not recommend approval of the plan at that time based upon the information available. The Court ordered production of recent tax returns, approved the appointment of an appraiser on behalf of the creditors' committee and continued the hearing to August 29, 1980. On that day, after further hearing, the Court ordered certain amendments to the disclosure statement and approved it.

The amended disclosure statement was distributed to the creditors and debtor was granted until September 22, 1980, to obtain acceptances of the plan. A tabulation of the voting shows that a majority in number of the unsecured creditors holding claims in the amount of $273,380.38 accepted the plan. Unsecured creditors rejecting hold claims in the amount of $403,873.33. Section 1126(c) provides that "A class of claims has accepted a plan if such plan has been accepted by creditors, other than any entity designated under subsection (e) of this section, that hold at least two-thirds in amount and more than one-half in number of the allowed claims of such class held by creditors, other than any entity designated under subsection (e) of this section, that have accepted or rejected such plan." Therefore, unless the vote of Reynolds is designated as not in good faith, the plan cannot be confirmed.

At the hearing on the motion to designate, both counsel for debtor and for Reynolds requested that the Court consider all previous testimony in ruling the motion. The recitation above sets out that testimony. There is nothing in that evidence which suggests that Reynolds cast a nega-

tive vote in order to gain some advantage for itself in relation to unsecured creditors. The amendment to the plan which was a result of Reynolds' objection to its classification did not improve its position or the amount to be distributed to it. The concern about the misappropriation, preferences, audits and management practices were shared by all the members of the creditors' committee. The voicing of those concerns did not result in any adjustment of the plan favorable to Reynolds.

Prior to the filing of bankruptcy there was an offer to pay 30% of the unsecured debt. Reynolds rejected the offer. The plan proposes a 10% payment which Reynolds has also rejected. Although there are many reasons why an unsecured creditor would reject a plan paying it some money, Reynolds has offered no explanation for its rejection nor is it obligated to do so. Debtor has not elicited any explanation but suggests that the rejection makes no economic sense because Reynolds would receive less in liquidation than it would under the plan. An examination of the various pleadings and of the testimony suggests that this conclusion is not inescapable.

In its schedules, debtor shows a value of machinery and equipment of $437,768.44, vehicles of a value of $118,338.10, and real estate and improvements of a value of $525,000.00. The machinery and equipment were subject to a security interest held by Central Bank of Lebanon securing an SBA loan, the balance due being $114,899.32. The real estate was subject to a deed of trust to United Savings and Loan Association of Lebanon, the balance due being $426,044.62.

In its disclosure statement, debtor suggested that the machinery and equipment, being of a special nature, would bring little over salvage value at liquidation and suggested that funds generated at a sale in liquidation might not be sufficient to pay the secured creditors. Debtor suggested the same as to its real estate. At the hearing on the motion, there was testimony that the building was worth about $240,-000.00 and the land about $3,000.00 an acre

or about $57,000.00 for the approximately 19 acres. The independent appraisal of machinery and equipment showed a value of $68,535.00.

The independent appraisal differs from the schedules in substantial respects. For example, the independent appraisal lists 9 vehicles with a total value of $2,500.00. The schedule shows 16 vehicles, with a total value of $64,087.49, including a 1978 Cadillac valued at $10,000.00 and a 1976 Chevrolet truck valued at $14,590.00. Neither of these vehicles appear on the report of the independent appraiser.

In the lists of machinery and equipment, numerous variances appear. Debtor lists a 20' Hydraulic brake at $53,462.90. The independent appraiser's most valuable brake, which he describes as homemade, is $5,500.00. Similarly, 6 spray booths are valued by debtor at $30,161.22 while the independent appraiser reports 3 booths at a total value of $500.00. Debtor values a Yale forklift at $9,723.20 while the independent appraiser values it at $5,700.00. With some differences in counting because of batches, debtor lists 202 separate items of machinery and equipment while the independent appraiser lists only 126.

It is not likely that a liquidation sale of the real estate would bring a price in excess of the security interest. It is probable that the sale of the machinery and equipment, if debtor's valuations are even 50% accurate, would produce some payment for the unsecured creditors. Even if it did not, however, there is no evidence that the rejection is unsound economically although Reynolds stands to lose a 10% payment. It may well be that a write-off of the whole debt is worth more than the payment after taxes. As Collier notes, "the purely selfish or self-interested reasons by which men judge what is best for themselves, even though they may seem unreasonable to others, do not necessarily amount to bad faith." 6 Collier on Bankruptcy ¶ 9.21 at 1676 (14th Ed.). See also *Matter of Pine Hill Collieries Co.*, 46 F.Supp. 669 (E.D.Pa.1942).

Reynolds is not an investor in debtor. The plan of reorganization contemplates payment to Reynolds from funds provided by investors. Payment to Reynolds does not depend upon the future success of debtor's business. It is unlikely that Reynolds will sell to debtor in the future, except for cash. Thus, the vote of Reynolds cannot be viewed as an attempt to influence a continuing relationship in its favor.

Nor does the existence of the anti-trust suit against Reynolds constitute grounds to designate the vote as not in good faith. Counsel for debtor believe that the suit has merit but have assigned it no value in debtor's schedules. Reynolds' counsel contends the suit is groundless but points out that it will be expensive to defend. Whatever value the suit has, it is an asset of the estate and there is no evidence to suggest that the trustee would be less vigorous in pursuing it than would debtor's counsel. Nor is the fact that counsel have discussed settlement of significance, even though the discussion suggested that the suit would be dismissed if Reynolds accepted the plan. Acceptance would have benefitted Reynolds; it gained no benefit by rejection. There is no improper motive disclosed in its conduct.

The Court concludes that there is insufficient evidence to find that the rejection of the plan by Reynolds is motivated by bad faith. The motion to exclude the vote by Reynolds is DENIED.

This Order constitutes Findings of Fact and Conclusions of Law pursuant to the provisions of Rule 752 of the Bankruptcy Rules.