**In re A.D.W., INCORPORATED, Debtor.**

**Bankruptcy No. 84–06348.**

United States Bankruptcy Court, D. New Jersey.

June 20, 1988.

---

Katz, Ettin, Levine & Kurzweil, P.A.[1] by Fredric R. Cohen, Cherry Hill, N.J., for Stephen Altman.

Pincus, Verlin, Bleustein, Hahn & Reich by Geoffrey L. Steiert, Collingswood, N.J., for Unsecured Creditors' Committee.

Davis, Reberkenny & Abramowitz by Lawrence L. Abt, III, Cherry Hill, N.J., for trustee.

Venzie, Phillips & Warshawer by Wayne J. Martorelli, Stradley, Ronon, Stevens & Young by Donald M. Collins, Philadelphia, Pa., for Pa. Nat. Mut. Cas. Ins. Co.

Venzie, Phillips & Warshawer by Robert P. Ewing, Philadelphia, Pa., for Employees Ins. of Wausau.

U.S. Atty.'s Office by Paul A. Blaine, Asst. U.S. Atty., Camden, N.J.

OPINION

ROSEMARY GAMBARDELLA, Bankruptcy Judge.

Before the Court is a motion filed on behalf of Stephen Altman, an equity holder of the debtor corporation to implement a certain plan of reorganization filed by Altman in this proceeding. That motion seeks, *inter alia* to disqualify and exclude the vote of Pennsylvania National Mutual Casualty Insurance Company ("Penn National"), which voted to reject the plan. It is that portion of the motion that the court decides herein.

On December 5, 1984, A.D.W., Incorporated filed a voluntary petition under Chapter 11 of the Bankruptcy Reform Act of 1978, as amended by the Bankruptcy

---

1. On May 26, 1988 Stephen Altman filed an "Appearance pro se to represent the interest of Stephen Altman, an equity shareholder and proponent of a Plan of Reorganization."

Amendments and Federal Judgeship Act of 1984 (hereinafter "Bankruptcy Code"). The debtor is a privately held New Jersey corporation whose business is that of construction, acting as general building contractor on commercial, municipal and residential construction projects. The debtor operated its business as a debtor-in-possession until this court, by order dated December 17, 1986 directed that the United States Trustee appoint a trustee. The United States Trustee, on December 19, 1987 appointed James J. Cain Chapter 11 Trustee.

On January 27, 1988 this court entered an order approving the adequacy of a Fourth Amended Disclosure Statement filed by Stephen Altman on January 21, 1988 in connection with a Third Amended Plan filed by Altman on December 23, 1987 (hereinafter referred to as the plan). The plan is proposed by Stephen Altman as proponent. Altman is an equity security holder of the debtor corporation and is its principal operating officer.

On April 15, 1985, Penn National filed a Proof of Claim in this case in the sum of $977,141.73. Penn National's claim consists of alleged losses sustained and expenses incurred as construction surety to the debtor, a contractor, in connection with the Debtor's alleged default and its alleged failure to pay subcontractors and suppliers on various construction projects bonded by Penn National. Pursuant to an Agreement of Indemnity, executed by Penn National as surety and by the Debtor, Altman and his wife, Greta Altman, as indemnitors, and filed by Penn National as a UCC–1 Financing Statement, Penn National has claimed a perfected security interest in various assets of the Debtor, including all sums due or which may become due under any contract of the Debtor bonded by Penn National.

On September 12, 1986, the Debtor, Steven Altman and Greta Altman filed suit against Penn National and other parties in the United States District Court for the Eastern District of Pennsylvania, alleging *inter alia,* that Penn National deliberately and wrongfully endeavored to destroy the Debtor's construction business by interceding in certain construction projects wherein the Debtor was performing work under contracts bonded by Penn National ("The District Court litigation").

The debtor in the litigation alleged that Penn National improperly took control of certain of the debtor's projects, receivables and affairs dishonoring its cash flow and trade credit. The debtor in its complaint alleged violation of the federal Racketeer Influenced and Corrupt Organizations (RICO) statute, 18 U.S.C. § 1961 *et seq.* and pendant claims of negligence, breach of contract, tortious interference with business relations, tortious disavowal of contractual obligations, quantum meruit, fraud, deceit and misrepresentation, negligent misrepresentation, and intentional and negligent infliction of emotional distress.

Penn National filed an Answer denying all of the substantive allegations of wrongdoing set forth in the Complaint. In addition, Penn National asserted a Counterclaim against all plaintiffs, seeking recovery of costs and expenses totaling $1,122,-079.48, allegedly incurred by Penn National as a result of the Debtor's failure to discharge its obligations on the bonded projects. Penn National's Counterclaim was premised upon the aforementioned Agreement of Indemnity, which it asserted bound the Debtor and the Altmans individually to indemnify Penn National against such costs and expenses. The plaintiffs, including the debtor, filed a reply to the Counterclaim seeking in part dismissal of the Counterclaim. The plaintiffs have also asserted Counterclaims in reply asserting violation of the federal RICO statute, 18 U.S.C. § 1962(b) and (c), tortious interference with business relations, breach of the covenant of good faith and fair dealing, negligence, fraud, deceit and misrepresentation. Although the dollar amounts differ, the damages asserted on Penn National's Counterclaim are essentially one and the same as the costs and expenses set forth in its proof of claim.[2]

2. By memorandum opinion and order filed May 13, 1988 in the district court litigation, the Honorable Donald W. Van Artsdalen, U.S.D.J. granted summary judgment in favor of Penn Nation-

The Fourth Amended Disclosure Statement approved by this court on January 27, 1988 states with regard to the accounts receivable litigation other than Penn National:

> Litigation will be required to pursue the above claims which will involve costs and attorneys' fees. This plan proposes that the above described litigation be submitted by Proponent, to the Trustee, for the Trustee to institute and supervise litigation to collect sums due. The Trustee may abandon certain claims in which case Altman will pursue said claims.

Fourth Amended Disclosure Statement at p. 12. With regard to the Penn National litigation, the Fourth Amended Disclosure Statement provides:

> Counsel for the Debtor in the action against Penn National is the Philadelphia law firm of Kohn, Savett, Klein & Graf. Specifically, the firm's senior partner, Harold E. Kohn, is handling the litigation. Mr. Kohn is experienced in the field of civil litigation for over 45 years. He and his office enjoy a national reputation as experts in this area. This law firm has been appointed by the Court as counsel for the Debtor to pursue this lawsuit. Counsel will only be paid a fee by the Debtor if there is a recovery from Penn National and out of said recovery. The subject Plan of Reorganization would vest in the firm Kohn, Savett, Klein & Graf the authority to manage the subject litigation. Any party in interest may make application to the Court, on notice to all interested parties, for approval of a compromise or settlement. Altman is personally advancing the costs of the litigation which will be a charge to any recovered Penn National proceeds.

Fourth Amended Disclosure Statement at p. 15.

Prior to the distribution of ballots to those creditors entitled to vote to accept or reject the plan, Altman on October 16, 1987 filed a motion to have Penn National barred from voting on the plan on the basis of an asserted "conflict of interest", based upon its status as both a creditor in this case and a litigant in the District Court litigation.

This court by order dated December 14, 1987 denied without prejudice Altman's Motion to disqualify Penn National from voting on the plan. That decision was based upon a finding by this court that a creditor's vote on a plan cannot be disqualified before the votes are actually cast and tabulated. The Court's December 14, 1987 Order fixed by mutual consent of the parties that the Penn National's claim be deemed secured in the sum of $162,000.00, and unsecured in the sum of $815,141.73, for the sole purpose of accepting or rejecting the plan proposed by Altman.

Balloting on the plan then proceeded before this Court. Penn National cast its ballot in favor of rejecting the plan. At the confirmation hearing originally scheduled on March 7, 1988, counsel for Altman disclosed that 37 unsecured creditors had submitted ballots. Of those 37, a total of 34 creditors, with claims totalling $310,746.35 in the aggregate, voted to accept the plan, and a total of three creditors, with claims totalling $833,733.33 (including Penn National's unsecured claim of $815,141.73), voted to reject the plan. Penn National also voted to reject the plan as a secured creditor with a claim in the sum of $162,000.00. The plan has not been accepted by the class of unsecured creditors that hold at least two-thirds in amount of the allowed interests of such class that have accepted or rejected the plan, as required by 11 U.S.C. § 1126(d). Accordingly, confirmation of the plan depends upon whether or not Penn National's ballot is deemed valid. Penn National opposes the relief sought by Altman herein.

Altman asserts herein that Penn National makes no legitimate vote on the basis of maximizing its recovery as a creditor. Rather, Altman asserts, Penn National seeks to minimize the estate's recovery by

al on Counts I (Civil Rico); II (Tortious Interference with Business Relations); VII (Negligence); VIII (Fraud, Deceit and Misrepresentation); IX (Negligent Misrepresentation); and X (Intentional Infliction of Emotional Distress), and denied Penn National's motion for summary judgment as to Count V (Breach of Covenants of Good Faith and Fair Dealing).

defeating the plan so that it can challenge the standing of the debtor to pursue the district court action. Altman also argues that Penn National is governed by "an absolute conflict of interest" in that it voted against the plan solely to avoid the action against it as a defendant in the pending lawsuit. Altman asserts that such a motive "conflicts with the legitimate interests of the other creditors to be paid from the litigation recovery and is at variance with the debtor's proper attempts to maximize its assets." (*See* Memorandum Supporting Motion of Stephen Altman to Implement Plan of Reorganization, filed March 15, 1988 at p. 8).

Section 1126(e) states:

> (e) On request of a party in interest, and after notice and a hearing, the court may designate any entity whose acceptance or rejection of such plan was not in good faith, or was not solicited or procured in good faith or in accordance with the provisions of this title.

11 U.S.C. § 1126(e). Courts and commentators have recognized that "good faith" was left undefined by both the Code and the rules "with the idea that the content of the phrase would be developed and construed in accordance with the cases as they arose." 5 *Collier on Bankruptcy*, Para. 1126.05 at p. 1126–16 (15th ed. 1985); *In re MacLeod*, 63 B.R. 654, 655 (Bankr.S.D.Ohio 1986).

The Supreme Court in *Young v. Higbee Co.*, 324 U.S. 204, 65 S.Ct. 594, 89 L.Ed. 890 (1945) set the standard for good faith under the predecessor of § 1126(e), namely Section 203 of Chapter X of the Bankruptcy Act, 11 U.S.C. § 603. In that case, two stockholders objected to confirmation of a plan of reorganization on the ground that the plan favored a junior indebtedness purchased by two directors. The stockholders appealed from a district court decree confirming the plan. The appeal was based almost entirely on objections to allowances for the junior indebtedness which left less for distribution among all preferred stockholders, and the appeal sought to set aside the confirmation of the plan. The stockholders then sold their stock and their ap-

peal to the claimants under the junior debt for a sum greatly in excess of the par or market value of the stock. Another preferred stockholder attempted to intervene to preserve the appeal but intervention was denied and the appeal dismissed. A petition by the same preferred stockholder to employ counsel to compel an accounting from the two selling stockholders of the difference between what they received and the fair market value of the stock, or to require the two stockholders to pay over that amount to the preferred stockholders was dismissed by the district court. The Sixth Circuit Court of Appeals affirmed the dismissal of the petition. The Supreme Court reversed.

The Supreme Court found that since the appeal affected the rights of all preferred stockholders, it was a class appeal and not merely of the two individuals. The court found that the privilege of appeal given to the stockholders under Section 206 of the Chandler Act did not vest them with an indefeasible right to sell their appeal to the disadvantage of all other stockholder members of the class, and stated:

> [O]ne of the prime purposes of the bankruptcy law has been to bring about a ratable distribution among creditors of a bankrupt's assets; to protect the creditors from one another. And reorganization statutes look to a ratable distribution of assets among classes of stockholders as well as creditors. There would be no ratable distribution of this bankrupt estate if Potts and Boag could utilize their statutory right of appeal to get for their preferred stock $7.00 for every $1.00 paid to other preferred stockholders.

*Young v. Higbee Company, supra,* 324 U.S. 204 at 210, 65 S.Ct. at 597–98.

The court went on to declare that these two stockholders owed their class the obligation to perform in good faith, comparing the appeal to a vote considered under former Section 203 of Chapter X of the Bankruptcy Act, 11 U.S.C. § 603, the predecessor of Section 1126(e):

> If Potts and Boag had declined to accept this plan in bad faith, the court under

section 203 could have denied them the right to vote on the plan at all. The history of this provision makes clear that it was intended to apply to those stockholders whose selfish purpose was to obstruct a fair and feasible reorganization in the hope that someone would pay them more than the ratable equivalent of their proportionate part of the bankrupt assets.

*Young v. Higbee Company, supra,* 324 U.S. at 210–11, 65 S.Ct. at 598.

The court in *In re Landau Boat Company,* 8 B.R. 432, 434 (W.D.Mo.1981), dealt with a motion by the debtor to determine that the rejection of its Chapter 11 plan by one of its unsecured creditors, Reynolds Metal Company, was not in good faith, pursuant to 11 U.S.C. § 1126(e), and that the rejection should be ignored in determining whether the plan should be confirmed. Among the reasons argued by the debtor to support its contentions under § 1126(e) was the fact that the debtor and Reynolds were engaged in litigation, including an anti-trust claim by the debtor. The debtor argued that if the debtor were proceeding in liquidation rather than reorganization, this litigation would be directed by the trustee in bankruptcy rather than the debtor's officers. The debtor further argued that the trustee would have less incentive to pursue the litigation than would the debtor's officers and that witnesses might be lost if the corporation were liquidated. 8 B.R. at 433.

In discussing the issue of good faith voting, the court set forth the standard to be applied under § 1126(e):

Collier quotes the testimony of SEC Commissioner (later Justice) Douglas to the effect that Section 203 was intended to prevent creditors from the "use of obstructive tactics and of holdup techniques [to] exact for themselves undue advantages" through acceptance or refusal to accept a plan or secure "some particular preferential treatment ...for the price of their vote. 6 Collier on Bankruptcy, Para. 9.21 at 1674 (14th ed.). Self interest is not necessarily, however, bad faith. "The test, then, seems to be

whether or not those sought to be disqualified have some 'ulterior' reason for their action which looks to some special advantage or increment to be gained thereby." 6 Collier on Bankruptcy, Para. 9.21 at 1676 (14th ed.).

8 B.R. at 434.

Prior to concluding that there was insufficient evidence to find that the rejection of the plan by Reynolds was motivated by bad faith, the court addressed the debtor's contentions regarding the existence of outside litigation as a motivating factor in Reynolds' vote. The court stated:

Nor does the existence of the anti-trust suit against Reynolds constitute ground to designate the vote as not in good faith. Counsel for debtor believe that the suit has merit but have assigned it no value in debtor's schedules. Reynolds' counsel contends the suit is groundless but points out that it will be expensive to defend. Whatever value the suit has, it is an asset of the estate and there is no evidence to suggest that the trustee would be less vigorous in pursuing it than would debtor's counsel. Nor is the fact that counsel have discussed settlement of significance, even though the discussion suggested that the suit would be dismissed if Reynolds accepted the plan. Acceptance would have benefitted Reynolds; it gained no benefit by rejection. There is no improper motive disclosed in its conduct.

*In re Landau Boat Company, supra,* 8 B.R. at 436.

The court in *Matter of Featherworks Corporation,* 36 B.R. 460 (E.D.N.Y.1984), was faced with an appeal from two orders of the Bankruptcy Court, one of which reopened the voting on the proposed Chapter 11 plan for reorganization and a second order which denied confirmation of the plan. One of the issues, relevant for our purposes, that the district court in *Featherworks* was faced with was whether the bankruptcy court erred in finding that payment of $25,000.00 by the debtor corporation's principal officer to E. Heller & Co., a major creditor, was made to purchase Heller's change of vote on the Chapter 11 plan

of reorganization from rejection to acceptance of the plan and whether the bankruptcy court erred in refusing to permit Heller from changing its vote from rejection to acceptance of the plan. Before the reorganization, Heller had financed the debtor's inventory and accounts receivable which were pledged as security for its loans. Heller was owed approximately $1.5 million. The Debtor asserted that the plan was drafted almost to Heller's specifications, but that after the drafting, Heller uncovered misrepresentations as to the quality of some of its security and that in response, Heller rejected the plan after it had previously expressed an intention to approve the plan. The change of heart by Heller materialized after the principal director of the debtor paid Heller $25,000.00 for a general release and reassignment of uncollected pre-petition accounts receivable. Another creditor objected to Heller's changing its vote, asserting that the purported settlement of this collateral claim constituted a criminal offense under 18 U.S.C. § 152 and bad faith under 11 U.S.C. § 1126(e).

The district court in *Featherworks* noted that good faith and self-dealing are not mutually exclusive. *Matter of Featherworks Corporation, supra*, 36 B.R. at 462. The district court went on to state with respect to the bankruptcy court's denial of Heller's application to change its vote, that "the court does not believe that the law countenances vote trafficking and assertedly otherwise innocent self-dealing after the votes have been cast." *Matter of Featherworks Corporation, supra*, 36 B.R. at 463. The court went on to quote the legislative history of the Bankruptcy Act, Section 203 dealing with bad faith:

A year before the House Committee on the Judiciary held its extensive hearings on the Chandler Act, a circuit court of appeals held that a creditor could not be denied the privilege of voting on a reorganization plan under § 77B although he bought the votes for the purpose of preventing confirmation unless certain demands of his should be met. *Texas Hotel Corp. v. Waco Development Company*, 87 F.2d 395 (5th Cir.1936). The hear-

ings make clear the purpose of the committee to pass legislation which would bar creditors from a vote who were prompted by such a purpose. To this end they adopted the 'good faith' provisions of Section 203. Its purpose was to prevent creditors from participating who 'by the use of obstructive tactics and holdup techniques exact for themselves undue advantages from the other stockholders [/creditors] who are cooperating.' Bad faith was to be attributed to claimants who oppose the plan for a time until they were 'bought off'; those who 'refuse to vote in favor of a plan unless ...given some particular preferential advantage.' Hearings on revision of the Bankruptcy Act before the Committee on the Judiciary of the House of Representatives, 75th Cong., 1st Sess. on H.R. 6439, Serial 9, pg. 180–82.

*Matter of Featherworks Corp., supra*, 36 B.R. at 463 (citing authorities). The district court, finding that vote changing was the exception and not the rule, and that the debtor must demonstrate the propriety of Heller's actions, found that this burden was not sustained. The district court, accordingly, found no error in the bankruptcy court's ruling refusing to permit the creditor from changing its vote from rejection to acceptance of the plan. *Id.*

The district court in *In re Pine Hill Collieries Co.*, 46 F.Supp. 669 (E.D.Pa. 1942), in analyzing Section 203 of Chapter X of the Bankruptcy Act, the predecessor of Section 1126(e), stated:

It prescribes a standard of conduct defined by the elusive term 'good faith', which must be met under pain of disqualification. The test is plainly to be sought in the motives of the holder of the claims. The Securities and Exchange Commission suggests in its brief that if a cent is withheld to serve some ulterior selfish purpose good faith is wanting. If the emphasis be placed on 'ulterior' rather than 'selfish' this seems to be as practical a test as could be found. What is selfishness from the standpoint of those who derive no benefit from the conduct under scrutiny often becomes enlight-

ened self-interest if viewed from the standpoint of those who gain by it. If a selfish motive were sufficient to condemn reorganization policies of interested parties, very few, if any, would pass mustard. On the other hand, pure malice, 'strikes', and blackmail, and the purpose to destroy an enterprise in order to advance the interest of a competing business, all plainly constituting bad faith are motives which may be accurately described as ulterior.

*In re Pine Hill Collieries Company, supra,* 46 F.Supp. at 671.

The existence of the district court litigation involving Penn National, the debtor and the debtor's principals does not constitute grounds to designate the vote of Penn National as not in good faith. The plan, if approved would leave the pending litigation undisturbed. Penn National gains no benefit by rejection of the plan. Therefore, there is no improper motive disclosed in its conduct. The court concludes that there is insufficient evidence to find that the rejection of the plan by Penn National was done in bad faith. The motion by Altman to disqualify the vote by Penn National is denied.

An order in conformance with this Opinion shall be submitted.