In re PLEASANT HILL PARTNERS,
L.P., Debtor.

Bankruptcy No. 92–63772.

United States Bankruptcy Court,
N.D. Georgia,
Atlanta Division.

Jan. 6, 1994.

Bradley J. Taylor, Glass, McCullough, Sherrill & Harrold, Atlanta, GA, for debtor.

Peter Pearl, Smith, Gambrell & Russell, Atlanta, GA, for creditor.

### ORDER

MARGARET H. MURPHY, Bankruptcy Judge.

■ This case is before the court on Debtor's Motion to Designate Federal Home Loan Mortgage Corporation Pursuant to 11 U.S.C. § 1126(e) (the "Motion to Designate"). At the time the Motion to Designate was filed, the motion for relief from stay of Federal Home Loan Mortgage Corporation ("FHLMC") was pending, as was Debtor's Disclosure Statement. Both the motion for relief and the Disclosure Statement were scheduled for hearing August 24, 1993. Five days before the hearing, Debtor filed the Motion to Designate. The Motion to Designate was also heard August 24, 1993. The parties were allowed to file post-hearing briefs. The issues raised in the Motion to Designate are threshhold to approval of Debtor's Disclosure Statement and resolution of FHLMC's motion for relief from stay. Therefore, although Debtor's Motion to Designate is arguably premature,[1] as no votes have yet been cast, disposition of the Motion to Designate at this time is appropriate.

### STATEMENT OF FACTS

This is a single-asset real estate case. Debtor's principal asset is an 86–unit apartment complex known as Pleasant Hill Apartments located at 2500 Pleasant Hill Road in Fulton County, Georgia (the "Property"). The Property is secured by a first mortgage in favor of FHLMC executed October 3, 1984 in the original principal amount of $1.2 million.[2] The interest rate is 13.54% with a maturity date of December 1, 1999.

The security agreement between Debtor and FHLMC also contains a five-year "lock-in" which provided that Debtor could sell or refinance the Property during the first five years of the repayment period only with FHLMC's consent. In 1986 and 1988, Debtor sought such consent from FHLMC but was refused. That refusal is the subject of a lender liability lawsuit by Debtor against FHLMC.

On the date the petition was filed, March 2, 1992, the outstanding balance owed to FHLMC was $1,256,006.51. Although the fair market value of the Property has not been established, the parties agree FHLMC is undersecured. The Disclosure Statement sets forth that Debtor obtained an appraisal which showed the fair market value of the Property to be $800,000.

On July 26, 1993, Debtor filed its Second Amended Disclosure Statement and Plan, which was the subject of the hearing sched-

---

1. See, In re A.D.W., Inc., 90 B.R. 645 (Bankr.N.J. 1988).

2. This transaction was a refinancing of the original debt. The Property was purchased in December 1979 for a purchase price of $1.65 million.

uled for August 24, 1993. The Disclosure Statement and Plan set forth that Class 1 under the Plan consists of the claim of FHLMC and treats FHLMC's claim as fully secured.[3]

The Plan defines FHLMC's claim to include principal, prepetition interest at the non-default rate, postpetition interest at 7.5% and allowed fees and costs. The monthly payments under the Plan would be interest only. The maturity date remains December 1, 1999. Debtor contemplates sale of the Property or refinancing of the loan on or before the maturity date. Upon the sale or refinancing, FHLMC would receive all the amounts remaining unpaid.

Class 4 under Debtor's plan consists of Debtor's unsecured trade creditors. Debtor shows that it has 18 unsecured creditors whose claims total slightly more than $7,000. The Plan proposes to pay those unsecured creditors 50% of their claims on the effective date of the Plan and 50% sixty days thereafter. The remaining classes in Debtor's Plan are either priority creditors, are unimpaired, or are insiders.

Since the filing of Debtor's petition, FHLMC has purchased 95% in number and 99.6% in amount of the unsecured claims against Debtor. FHLMC contacted the unsecured creditors to offer to purchase their claims for the full amount claimed by the creditor to be owed. FHLMC disclosed that it was a creditor of Debtor with a security interest in the Property. No other disclosures were made: FHLMC did not reveal to the selling creditors that it was buying claims with the intent to block confirmation of Debtor's plan. FHLMC paid the unsecured creditors 100% of their claims. The only unsecured claim which FHLMC has been unable to purchase is a claim for $24; the creditor, without explanation, refused to sell its claim.

FHLMC has announced its intention to cast its Class 1 vote and all the votes for Class 4 against Debtor's plan. As FHLMC has announced its intention to vote its secured claim against Debtor's plan, Debtor may obtain confirmation over FHLMC's rejection only by employing 11 U.S.C. § 1129(b), fondly known among bankruptcy practitioners as "cramdown."

In order to effect a cramdown of FHLMC's interests, Debtor must obtain the acceptance of at least one class of non-priority, non-insider, impaired creditors. Pursuant to § 1126(c), acceptance by a class requires an affirmative vote by at least two-thirds in dollar amount and more than one-half in number of the allowed claims in a class. FHLMC's purchase of the Class 4 claims, therefore, gives FHLMC control of the acceptance or rejection of Debtor's plan by Class 4, Debtor's only non-priority, non-insider, impaired class. FHLMC has announced that it will cast its votes in Class 4 against the Plan. As a result, if FHLMC is allowed to so vote its Class 4 claims, Debtor will be unable to obtain a consenting class and will be unable to effect a cramdown of FHLMC's interests.

In the Motion to Designate, Debtor asserts the Class 4 votes of FHLMC should be "designated" pursuant to 11 U.S.C. § 1125(b) or § 1126(e). Pursuant to § 1126(c), "designation" of a vote results in that vote not being counted. Debtor, however, requests that, in addition to designating the Class 4 votes of FHLMC, this court should also deem those votes to have been cast in favor of Debtor's plan.

## CONCLUSIONS OF LAW

Issues regarding trading claims predate the Bankruptcy Code.[4] During the 1930's, when Congress, the Securities and Exchange

---

3. FHLMC objects to this provision in Debtor's plan, asserting that Debtor is improperly forcing upon FHLMC an election pursuant to 11 U.S.C. § 1111(b). Other substantive objections have been filed to Debtor's second amended disclosure statement. Those objections, however, are not the subject of this order. For the purposes of this order, the court will assume that Debtor's Disclosure Statement and Plan are not legally defective.

4. *See generally,* Fortgang & Mayer, *Trading Claims and Taking Control of Corporations in Chapter 11,* 12 Cardozo L.Rev. 1 (1990); Africk, *Trading Claims in Chapter 11: How Much Influence Can Be Purchased in Good Faith Under Section 1126?,* 139 Univ.Penn.L.Rev. 1393 (1992).

Commission and the courts were otherwise addressing trading in securities, trading in claims was also addressed under the Bankruptcy Act. Trading claims was regulated in Chapter X of the Bankruptcy Act with the intent to and for the purpose of protecting the securities-trading public. Trading claims was not regulated, however, in Chapters IX, XI and XII because Congress assumed that trade creditors and bank creditors knew their debtor and needed less protection.

■ When the Bankruptcy Code was promulgated and Chapter X, XI and XII were combined into the new Chapter 11, no regulation of claims trading was included in the Code or the Bankruptcy Rules.[5] Under the Bankruptcy Code, parties must, therefore, rely primarily upon §§ 1125(b), 1126(e) and 105,[6] as well as pre-Code law,[7] for the authority of the bankruptcy court to regulate trading claims. As a result of having no clear Congressional mandate regarding trading claims, the case law relating to trading claims is far from well-settled.

## SECTION 1125(b)

■ Debtor contends that FHLMC's purchase of claims constituted an improper solicitation of votes prior to approval of a disclosure statement, in violation of § 1125(b), which provides:

An acceptance or rejection of a plan may not be solicited after the commencement of the case under this title from a holder of a claim or interest with respect to such claim or interest, unless, at the time of or before such solicitation, there is transmitted to such holder the plan or a summary of the plan, and a written disclosure statement approved, after notice and a hearing, by

the court as containing adequate information.

Debtor argues that FHLMC's purchase of the unsecured creditors' claims was for the sole purpose of being able to vote those claims and that, therefore, the purchase constitutes the solicitation of a vote against Debtor's plan without proper disclosures.

Debtor cites no case law to support its argument that the purchase of claims may be deemed a § 1125 solicitation of votes. Section 1125 "solicitation" is usually construed very narrowly. *Century Glove, Inc. v. First Amer. Bank of New York,* 860 F.2d 94 (3d Cir.1988). In the instant case, FHLMC was very careful not to entreat the prospect sellers of unsecured claims to agree to sell in order to assist FHLMC in its plan-blocking maneuver. Apart from simply offering to purchase the claims immediately at full face value, FHLMC used no other stimulus or persuasion to induce the unsecured creditors to sell.

■ Although not cited by Debtor, however, case law does exist to support a requirement that a purchaser of claims must provide appropriate disclosures to prospective sellers of claims. In the case of *In re Revere Copper and Brass, Inc.,* 58 B.R. 1 (Bankr. S.D.N.Y.1985), Phoenix Capital Corporation sent letters to Debtor's creditors offering to buy their claims for immediate cash equal to 20% of the face value of the claims. Near the time the letters were sent, an article in the Wall Street Journal disclosed that the debtor had announced the outline of its plan of reorganization, which included payment of

5. The only provision in the Code or the Rules relating to the purchase and sale of claims in bankruptcy cases is Bankruptcy Rule 3001(e), which relates to transferred claims. Rule 3001(e), however, is entirely administrative and no court order approving the transfer of claims is necessary unless, after the required notice, objections are filed.

6. The bankruptcy court's power to regulate claims trading has been predicated on *American United Mutual Life Ins. Co. v. City of Avon Park,* 311 U.S. 138, 61 S.Ct. 157, 85 L.Ed. 91 (1940). More recently, the bankruptcy court's power under § 105 was held to be limited to acts which

further or implement a specific provision of the Bankruptcy Code. *Norwest Bank Worthington v. Ahlers,* 485 U.S. 197, 108 S.Ct. 963, 99 L.Ed.2d 169 (1988).

7. Recent statements by the Supreme Court support a conclusion that pre-Code law should continue to apply if the Code and legislative history show no Congressional intent to change the law. See, *United Savings Association v. Timbers of Inwood Forest Associates, Limited,* 484 U.S. 365, 108 S.Ct. 626, 98 L.Ed.2d 740 (1988); *Midlantic Bank v. New Jersey Department of Environmental Resources (In re Quanta Resources Corp.),* 474 U.S. 494, 106 S.Ct. 755, 88 L.Ed.2d 859 (1986).

65% of the face value of claims to unsecured creditors.[8]

In *Revere*, Judge Abram concluded that Phoenix Capital's failure to disclose the terms of an announced or filed plan to the prospective sellers of claims permitted the bankruptcy court to withhold approval of the transfers until the selling creditors were provided with such notice, together with 30 days in which to revoke their assignment of claims to Phoenix Capital.

> One of the evils attendant upon a solicitation of assignment of claims for a cash payment such as is being made by Phoenix is that solicited creditors may be unaware of their rights and options and fall prey to the belief that bankruptcy inevitably will result in their receiving the proverbial 10 cents on the dollar or worse.

Similarly, in the case of *In re Chateaugay*, Case No. 86 B 11270/334, 402 and 464 (Bankr.S.D.N.Y., March 11, 1988), Judge Lifland relied upon a failure of adequate disclosure to withhold approval of an assignment of claims.

Although neither Judge Abram or Judge Lifland cited any case law to support the imposition of a notice requirement upon purchasers of claims, the bankruptcy court's equitable power to impose a notice requirement where none expressly exists in the Code or the Rules may have its genesis in *American United Mutual Life Ins. Co. v. City of Avon Park*, 311 U.S. 138, 61 S.Ct. 157, 85 L.Ed. 91 (1940).

In the *City of Avon Park* case, the Supreme Court refused to confirm the city's Chapter IX plan because the city's fiscal agent had solicited votes from bondholders without disclosing that its previous purchases of bonds at 50 percent of their value gave the agent a financial interest in the success of the city's plan.

> The responsibility of the court entails scrutiny of the circumstances surrounding the acceptances, the special or ulterior motives which may have induced them, the time of acquiring the claims so voting, the amount

paid therefor, and the like. Where such investigation discloses the existence of unfair dealing, a breach of fiduciary obligations, profiting from a trust, special benefits for the reorganizers, or the need for protection of investors against an inside few or of one class of investors from the encroachment of another, the court has ample power to adjust the remedy to meet the need. The requirements of full, unequivocal disclosure; the limitation of the vote to the amount paid for the securities; the separate classification of claimants; the complete subordination of some claims, indicate the range and type of the power which a court of bankruptcy may exercise in these proceedings.

(Citations omitted) *Id.* at 145–146, 61 S.Ct. at 161–162.

In the instant case, Debtor failed to present any indicia of unfair dealing by FHLMC. FHLMC is not seeking to obtain better treatment for itself at the expense of other creditors of the estate. FHLMC paid 100% of the face amount of the claims. FHLMC seeks to gain no competitive advantage over Debtor or any creditor of Debtors. FHLMC sought to purchase all the unsecured claims and achieved that goal except as to a single $24 claim whose holder simply refused to sell. Unlike in the New York cases, the instant case does not involve the purchase and sale of securities. Therefore, no need for more disclosure by FHLMC exists.

**SECTION 1126(e)**

Debtor also contends FHLMC's votes should be designated because its acquisition of the unsecured claim and its rejection of Debtor's plan is not in good faith. Section 1126(e) provides:

> On request of a party in interest, and after notice and a hearing, the court may designate any entity whose acceptance or rejection of such plan was not in good faith, or was not solicited or procured in good faith or in accordance with the provisions of this title.

The Bankruptcy Code does not define good faith or bad faith. The statement in the

---

8. The debtor proposed to offer unsecured creditors three options: cash, cash plus common stock, or cash plus notes plus common stock.

House Report accompanying § 1126(e) provides only a conflict of interest as an example of bad faith:

> A person might have such a conflict, for example, where he held a claim or interest in more than one class. Exclusion from one class for voting purposes would not require his exclusion from the other class as well. The result is to overrule cases such as *Aladdin Hotel Corp. v. Bloom*, 200 F.2d 627 (8th Cir.1953), which, though not in the bankruptcy context, would appear to count votes for a reorganization plan motivated by an attempt to squeeze out a minority of a class. In that case, the conflict of interest of those voting for the plan was clear, but the court permitted the votes.

In the *Aladdin Hotel* case, equity holders acquired enough bonds to amend the terms of the mortgage securing the bonds, delaying maturity by ten years.

■ The legislative history of § 1126(e) shows that it was derived from § 203 [9] of the Bankruptcy Act and Rule 10–305(d).[10] The promulgation of § 203 and Rule 10–305(d) was designed to discourage:

> a fellow [who] goes out and buys securities at a default price and then sits back in a nuisance or strategic position and seeks to capitalize on that. It also covers the situation where he does not buy at a default price, but nevertheless is working a hold-up scheme on those who are trying to get these securities in during reorganization.

H.R. 6439, 75th Cong., 1st Sess. 183–4 (1937). Congress did not intend, however, to prohibit creditors from voting selfishly. "Self interest is not the same as ulterior motive or bad faith." *Kremer v. Clark (In re Frank Fehr Brewing Co.)*, 268 F.2d 170, 180 (6th Cir. 1959). *See also, In re Pine Hill Collieries Co.*, 46 F.Supp. 669 (E.D.Penn.1942).

The two models for defining bad faith are found in *Young v. Higbee Co.*, 324 U.S. 204, 65 S.Ct. 594, 89 L.Ed. 890 (1945), and *In re P–R Holding Corp.*, 147 F.2d 895 (2d Cir. 1945). The first model, found in the *Young* case, defines bad faith as the situation in which the claims purchaser demands better treatment than the rest of its class. The second model, found in the *P–R Holding Corp.* case, defines a bad faith purchase of claims as a purchase with an ulterior motive, which that court defines as a purchase "in aid of an interest other than an interest as a creditor."

Cases decided under 11 U.S.C. § 1126(e) are not uniform regarding the standards for disqualification of votes. In the case of *In re Gilbert*, 104 B.R. 206 (Bankr.W.D.Mo.1989), a creditor who was a business associate of the debtor held a secured claim in Class III and an unsecured claim in Class X. The creditor purchased another claim in Class X with the result that his vote of his own claim and the purchased claim enable the debtor to obtain an accepting impaired class and obtain confirmation of the plan. The creditor's averred purpose in purchasing the claim was to enable the debtor to obtain confirmation of the plan and, thereby, protect his claim in Class III. The court held the purchase and voting "was not inspired by a prohibited ulterior purpose." The court concluded that purchasing claims to control the vote in one class for the benefit of another is not an ulterior motive evidencing bad faith.

In the case of *In re Landau Boat Co.*, 8 B.R. 432 (Bankr.W.D.Mo.1981), the court placed a heavy burden of proof upon the debtor who sought disqualification of the vote of its major unsecured creditor with whom the debtor was also engaged in antitrust litigation. The debtor's plan provided for 10% payment of unsecured debt while liquidation would result in no recovery for unse-

9. Section 203 provided:
   If the acceptance or failure to accept a plan by the holder of any claim or stock is not in good faith, in the light of or irrespective of the time of acquisition thereof, the judge may, after hearing upon notice, direct that such claim or stock be disqualified for the purpose of determining the requisite majority for the acceptance of a plan.

10. Rule 10–305(d) provided:

For the purpose of determining the requisite number of acceptances, the court after hearing on notice to the creditor or stockholder may disqualify any acceptance or rejection of a plan or modification of a plan if such acceptance or rejection was not in good faith in the light of or irrespective of the time of the acquisition of the claim or stock by such creditor or stockholder.

cured creditors. The debtor argued the creditor's rejection of the plan made no economic sense. Alternatively, the debtor argued that the less vigorous approach a Chapter 7 Trustee would employ in respect to the antitrust litigation was an ulterior motive. The creditor offered no explanation for its rejection of the plan.

The court found that the creditor was under no obligation to explain its vote. The court speculated that completely writing off the debt may have been more valuable to the creditor than the 10% payment provided by the plan and the court refused to find the vote was cast in bad faith. The court quoted Collier on Bankruptcy, 14th Ed., for the proposition that "the purely selfish or self-interested reasons by which men judge what is best for themselves, even though they may seem unreasonable to others, do not necessary amount to bad faith."

In one of the most frequently cited cases involving trading claims, *In re Allegheny International, Inc.*, 118 B.R. 282 (Bankr. W.D.Pa.1990), the court disqualified votes by an investment firm, Japonica Partners, and confirmed the debtor's plan. Japonica was not a prepetition creditor of Debtor but purchased enough claims in two classes to wield a blocking position and to qualify Japonica as a party who could file a competing plan. The two classes in which Japonica purchased claims were "diametrically opposed" in litigation filed by the Creditor's Committee against secured bank lenders. The claims were purchased after approval of the debtor's disclosure statement and balloting had commenced. Japonica presented a competing plan which provided that Japonica would acquire control of the debtor. Neither the debtor's nor Japonica's plan received sufficient affirmative votes for confirmation.

Japonica's purpose was to gain control of the debtor, which the court found to be bad faith. The critical fact which resulted in the court's disqualification of Japonica's votes was that Japonica was a voluntary creditor who purchased claims to give it "unique control over the debtor and the process." Another indicia of Japonica's bad faith was the timing of its purchase and the amounts it paid for the claims. As Japonica approached the attainment of a blocking position, the amount it paid for the claims it purchased increased and then decreased after the critical percentage was reached. Japonica purchased almost exactly the amount required to block the plan.

The court concluded that the facts and circumstances surrounding Japonica's purchase of claims—Japonica's intent to take over the debtor, the timing of the purchases, the amount paid for the claims, Japonica was an "outsider" prior to its purchase of claims, Japonica's use of its veto power to improve its position—established that Japonica's votes were acquired and cast in bad faith and would be disqualified.

In contrast to the holding in *Allegheny International* is the holding of *In re Marin Town Center*, 142 B.R. 374 (N.D.Cal.1992). In the *Marin Town Center* case, as in *Allegheny International*, an "outsider" purchased an undersecured creditor's claim for the purpose of blocking confirmation in hopes that the creditor could acquire the debtor's main asset. The fair market value of the asset approximately equalled the amount paid for the claim. The court held that merely exercising a blocking position does not constitute bad faith. The creditor must be exercising the blocking position "for the ulterior purpose of securing some advantage to which the creditor would not otherwise have been entitled." *Marin Town Center*, 142 B.R. at 378–79. "Section 1126(e) does not require a creditor to have an interest in seeing the debtor reorganize." *Id.* at 379.

In the case of *Insinger Machine Co. v. Federal Support Co.*, 859 F.2d 17 (4th Cir. 1988), a creditor of the debtor was the defendant in a state court antitrust suit filed by the debtor. At the time the bankruptcy petition was filed, the lawsuit appeared to be the debtor's only asset. The creditor/defendant's vote against the debtor's Chapter 11 plan was disqualified by the bankruptcy court and the district court as cast in bad faith, those courts finding that the pendency of the lawsuit was sufficient evidence of the creditor's ulterior motive. The Circuit Court reversed, holding the pendency of the lawsuit, without more, was insufficient to evidence bad faith.

One's self-interest, however, does not provide an ulterior motive. [The creditor] was entitled to cast its vote in accordance with its perception of its self-interest, and nothing suggests that [the creditor] was motivated by any other interest or purpose.

*Id.* at 20.

■ Most of the case law discussed above notes that good faith does not require a creditor's selfless disinterest. The creditor's conduct in furtherance of its own interest, however, should not result in unfair disadvantage to other creditors . or the debtor. The Bankruptcy Code, § 1126(c), gives creditors a veto right; therefore, a creditor's taking of a blocking position is not, without more, bad faith.

■ In the instant case, FHLMC does not seek to gain a competitive advantage over Debtor or any of Debtor's creditors. FHLMC paid 100% to the unsecureds whose claims it bought; Debtor is not offering a better deal. FHLMC attempted to buy all the claims; the only creditor who did not sell holds a claim for approximately $24, and simply did not want to sell. Therefore, all unsecureds have been treated the same by FHLMC. FHLMC has gained no advantage over the unsecureds and has no ulterior motive.

The imprecise definition of "bad faith," however, surrounds the issue of whether FHLMC's determination to vote the purchased claims to block confirmation of Debtor's plan is bad faith. Debtor's position is that the "ill will" existing between Debtor and FHLMC is FHLMC's motive for purchasing the unsecured claims and blocking confirmation—regardless of the treatment of FHLMC's claim in Debtor's plan—and that such a motive constitutes bad faith. Debtor has attempted to show subjective bad faith by FHLMC—i.e., FHLMC has no good business reason for its actions; FHLMC's conduct is motivated by its "ill will" towards Debtor. The only harm Debtor will suffer is foreclosure. FHLMC will gain no unfair

advantage over Debtor or any other creditor. In fact, for the purposes of Debtor's suit against FHLMC upon foreclosure, Debtor's damages may no longer be speculative but liquidated.

Debtor directs attention to the proposed treatment of FHLMC's claim in Debtor's plan, which Debtor characterizes as financially much more favorable than liquidation or foreclosure. FHLMC's claim is, however, significantly impaired. FHLMC appears to have concluded that the transaction costs of dealing with this Debtor and its principal exceed the losses it may suffer by foreclosing rather than consenting to a reorganization of Debtor. Even assuming a particular animosity directed by FHLMC towards Debtor, FHLMC's conduct gains it no strategic, competitive or financial advantage and injures no creditor of Debtor's estate. Subjective ill will between Debtor and FHLMC is insufficient to establish a lack of good faith to support disqualification of FHLMC's votes. Further discovery by Debtor on the issue of motive would not be productive or dispositive.

■ Additionally, Debtor seeks that this court *both* disqualify FHLMC from voting its Class 4 claims *and* deem those un-cast votes as acceptances of the plan. Pursuant to § 1126(c), (d), and (e), "designation" of a vote means that the vote is *not counted.* Debtor offers no case law in support of its request to deem the votes as cast in favor of the plan and offers only § 105 to sustain such action.[11] No evidence suggests that the transferor creditors would have voted in favor of Debtor's plan. FHLMC's conduct does not appear to justify such a sanction. Accordingly, it is hereby

ORDERED that Debtor's Motion to Designate is DENIED. It is further

ORDERED that, on or before January 21, 1994, Debtor shall file an amended plan and disclosure statement. If no such amended plan and disclosure statement is filed within the time allowed, Debtor will be deemed unable to propose a feasible plan and

---

**11.** In the *P–R Holding Co.* case, the court refused to reinstate the votes of the former holders of the  purchased claims.

FHLMC may present an order lifting the automatic stay.

IT IS SO ORDERED.