Orest **PANZA**, Frank Smith, Frank Panza, Stanley Halovanic, Joseph Mali, Sam La Cava, and Ralph Zoerb, Plaintiffs,

v.

**ARMCO STEEL CORPORATION,** Defendant.

**Civ. A. No. 62–284.**

United States District Court
W. D. Pennsylvania.

Aug. 22, 1962.

---

Samuel L. Goldstein and Leo Kostman, Pittsburgh, Pa., for plaintiffs.

David B. Buerger and John G. Buchanan, Jr., Pittsburgh, Pa., for defendant.

GOURLEY, Chief Judge.

This matter comes before the Court on defendant's motion to dismiss plaintiffs' class suit containing two causes of action:

1. To recover damages for breach of plaintiffs' seniority rights under certain collective bargaining agreements on the shutting down and movement of certain of defendant's plant facilities from Etna to Ambridge, Pennsylvania.

2. To recover damages based upon defendant's alleged fraud in misrepresenting certain material facts to the Labor Union and the District Court.

### HISTORY

In order to view the motion in its proper perspective, it is incumbent to review the history of all proceedings which give rise to the present dispute. Since this member of the Court disposed of all matters which related to the controversy since the date that the United States District Court first assumed jurisdiction, I am personally familiar with all the facets and ramifications of the dispute which involved innumerable hours of extra-judicial negotiation and discussion.

The seeds of the controversy are planted, nurtured and cultivated in the soil of automation and glaringly demonstrates the ruthless toll which automation, as a necessary concomitant to industrial progress, is taking in the stark, bleak reality of loss of livelihoods among so many of our industrial employees.

The lawsuit is the culmination of the defendant steel company, which has plants at both Etna and Ambridge, Pennsylvania, closing the Etna plant and constructing a new, modern combination pipe mill as an adjunct to the Ambridge plant.

The closing of the Etna plant was precipitated by its antiquated condition and the inability to operate it profitably. For many years the Etna plant manufactured welded pipe and electrical conduit, and was capable of producing a small range of pipe sizes at only moderate speeds. The decision was therefore made to install a modern combination pipe mill at Ambridge, where the new mill and facilities would be integrated into the Ambridge operations.

The employment dislocation is glaringly brought into focus in the realization that 328 men employed with the new and modern equipment are producing the equivalent of the same product for which 850 men were employed at Etna.

At the time that defendant announced its intention of closing the Etna plant, a State Court action was brought in behalf of the United Steelworkers of America by its Locals Nos. 1244 and 2592, and their District Director against the defendant from repudiating collective bargaining agreements between the parties by terminating and discharging the members in the Etna plant of the defendant company and from filling any new job created in Ambridge as a result of the new facilities with members other than those transferred from Etna.

Subsequently, defendant removed the action to this Court at Civil Action No.

61–10 and filed a motion to dismiss the action on the ground that the agreement between the parties provided for disposition of the question through arbitration.

Thereupon, this member of the Court, after a most extended and protracted argument, ordered the parties to negotiate in an attempt to settle their differences and to proceed to arbitration if a satisfactory settlement was not accomplished.

As a preliminary to the Court's directed negotiation, the three local unions and their directors were requested by the International Union President, David J. McDonald, to meet in order to develop a harmonious position with respect to the transfer of the Etna employees. In this connection, the extraordinary and conscientious efforts which Mr. McDonald extended in solving a tragic dilemma brought on as a by-product of industrial progress is a tribute and example of dedicated, responsible and competent union leadership.

The International President selected a three-member commission of the International Executive Board of the Union to assist the locals in reconciling their differences and in developing a unified union position as a basis for the required negotiations with the company.

Despite the Commission's earnest efforts to persuade them otherwise, the local unions refused to budge from their earlier positions.

The Commission, thereupon, on its own volition, made an intensive study of the divers facets of the seniority rights of the parties, and after conducting extensive hearings, submitted a proposed plan which was approved by the International Union Executive Board, and the Commission was instructed to negotiate with the company for its recommended solution.

Nevertheless, the Ambridge Union refused to officially participate, and the company, as a matter of industrial relations policy, preferred not to execute the proposed Settlement Agreement.

In view of the hopeless stalemate which existed, and the willingness of the Etna Locals and the International Union to accede to arbitration, the Court recognized arbitration as the only reasonable solution to an otherwise insurmountable industrial conflict which, if unresolved, would have left in its wake the scars of continuing labor strife and industrial dislocation.

It is noteworthy and extremely significant that the officers of Locals 1244 and 2592 of the Etna plant and their Director initiated the proceeding, never appealed from the Court's directive that they proceed to arbitration, and such arbitration was conducted on the basis of a Submission Agreement between the Commission and the International Union. Etna Locals 1244 and 2592 accepted the agreement and participated in the arbitration, and the Ambridge Local, which failed in its appeal from this Court's order that it also participate in the arbitration, was also present and participated.

## VESTED RIGHTS OF EMPLOYEES

Plaintiffs' first cause of action is grounded on the thesis that as employees they had acquired seniority rights that had been earned by compliance with the terms of the collective bargaining agreements, as well as other rights under the pension plan, welfare plan and group insurance plan between an employer and a labor union, which had become vested and fundamental, and that such rights could not be unilaterally annulled by the movement of the factory where the plaintiffs were employed from one city to another.

In support of their position, plaintiffs place great reliance on a recent decision of this Circuit. Metal Polishers, Buffers, Platers and Helpers Int. Union, Local 44, v. Viking Equipment Co., 278 F.2d 142 (3 Cir.) ; Zdanok v. Glidden Co., 288 F.2d 99 (2 Cir.).

█ The conclusions enunciated in both cases, in my judgment, are basically sound and conclusively supportable by the facts which give rise to the legal question presented. I heartily endorse the view, which is not contested in this proceeding, that seniority rights of em-

ployees, together with similar rights adverted to, are fundamental and vested, and are not to be annulled and obliterated by the simple expedient of moving a plant from one area to another.

I am extremely mindful of these vested rights, together with the expenditure of limitless human resources which they represent, having noted the many years of dedicated service and labor which have been rendered by the plaintiff employees in behalf of the defendant company.

■ The factual circumstances of the plant transfer, however, render these authorities inapplicable. In the cases cited, an actual transplanting of plant facilities from one area to another occurred, so that the vested employees' rights attached and were rightfully preserved.

As to the Etna plant herein involved, only a small amount of Etna equipment, or less than 20 per cent, was moved. True, the new mill at Ambridge produces the same end-product as the old mill, that is, continuous weld pipe. But the new plant at Ambridge accomplishes considerably more by producing a continuous weld pipe and electrical weld steel pipe at speeds almost four times as great as before, and is capable of stretch-reducing welded pipe to final size and seamless pipe to smaller sizes, producing a wider range of pipe sizes and performing processes never before performed at either Etna or Ambridge. There is no segregation of the new Ambridge facilities from the existing plant. In actual fact, the new facilities were integrated into the existing Ambridge operation and the Etna functions became indistinguishable from the Ambridge functions. The transfer at most, therefore, constituted an integration of part of the Etna facilities with the Ambridge plant, so that Etna, by and large, experienced a shutdown of its plant and not a transplanting or transfer.

As to which employees, those of the Etna or Ambridge Locals, would acquire these jobs created a non-negotiable conflict peculiarly indigenous to arbitration since both the Etna and Ambridge Locals claimed all of the jobs.

In this connection, plaintiffs reject arbitration despite their active participation in the proceedings and agreement by their counsel to so participate, suggesting that the Agreement together with the Constitution of the International Union did not authorize the relegation of a dispute to arbitration where vested rights were in the balance.

■ Article XVII, Section 1, of the Constitution of the United Steelworkers of America provides that the International Union shall be the contracting party. Article XVII, Section 3, provides that the members have delegated to the Union the power to act exclusively to represent them in all matters arising out of the employer-employee relationship.

■ The Union agreement provides that any matter "which involves the interpretation or application of, or compliance with, the provisions of this agreement" is a grievance under Section 6.3, while Section 6.42 provides for arbitration upon inability of the parties to negotiate a grievance. The latter arbitration clause does not exclude from arbitrable subjects either seniority or interplant transfers, and in the absence of any express provision excluding a particular grievance from arbitration, only the most forceful evidence of a purpose to exclude the claim from arbitration can prevail. United Steelworkers of America v. Warrior & Gulf Navigation Co., 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409.

Assuming I were in error, however, in my conclusion that under the prevailing agreement as well as the Constitution of the International Union, the conflict properly could be relegated to arbitration, another cogent and indefeasible reason exists why the assignment of the dispute to arbitration was proper and in accordance with law.

Aside from the collective bargaining agreement which provided for arbitration of grievances between the Company and the Locals, arbitration, in the instant proceeding, stems from a Special Sub-

mission Agreement between the Company and the International Union, which called for the arbitrator to decide "what is the most appropriate resolution of the dispute," signed for the International Union by its General Counsel and for the local unions by their Presidents.

The International and the Etna Locals appeared as parties in the hearing before the arbitrator with the International and the Etna Locals being represented by separate counsel. The Ambridge Local, which is not a party to this action, did not participate although an observer was present. The Etna Locals presented witnesses and cross-examined adversary witnesses.

The identical issue which confronted the Court in the first instance, as to whether the Etna employees had a right to follow their jobs to Ambridge, was the specific issue presented by the Etna locals to the arbitrator.

The arbitrator concluded that a settlement worked out by the International Union and the Company, which called for granting 206 jobs to the Etna employees, was a most appropriate solution, making available to them rights which they would not be entitled to under existing agreements.

The Company and the International Union, acting on behalf of itself and the Local Unions Nos. 1360, 1244 and 2592, on June 9, 1961, entered into an agreement putting into effect the arbitration award.

Whereupon the International and the Locals stipulated for dismissal with prejudice of the proceeding originally pending in this Court, which Order was approved on September 12, 1961.

The law appears well settled that rights of individual employees can be bargained away by the union representing them in collective bargaining. Zdanok v. Glidden Company, supra;

Oddie v. Ross Gear & Tool Co., (6 Cir.), 305 F.2d 143. Having voluntarily submitted to arbitration through their duly constituted representatives, I find no basis upon which dissatisfied individual constituent employees can attack an arbitration award in conformity with law and equity.

### ISSUE OF FRAUD

Plaintiffs' second cause of action is predicated upon the contention that the arbitration adjudication should be annulled for the reason that the company perpetrated a fraud at the arbitration hearing in misrepresenting the number of jobs which would be available at the new plant at Ambridge.

An arbitration award, unless and until invalidated, creates or authoritatively declares rights even as a judgment does. Nix v. Spector Freight System, Inc., 264 F.2d 875 (3 Cir.).

A judgment may not be set aside collaterally even if founded on perjured evidence when the matter was actually presented and considered in the judgment assailed. United States v. Throckmorton, 98 U.S. 61, 66, 25 L.Ed. 93. If the judgment is for the defendant, it operates as a bar to a subsequent action by the plaintiff upon the original cause of action, even though the judgment is erroneous, Restatement of the Law of Judgments, Section 45(f). The doctrine of collateral estoppel makes the 1961 proceeding conclusive as to any essential fact or question, Vanderveer v. Erie Malleable Inran Co., 238 F.2d 510, 512 (3 Cir.).

Construing all facts and allegations in the plaintiffs' complaint as true and correct, no basis exists in law upon which the instant class suit is maintainable and defendant's motion to dismiss the complaint will be granted.

An appropriate order is entered.