In re Peter KOVALCHICK and Donna
Lyn Kovalchick, Debtors.

In re Michael KOVALCHICK and
Cathy Kovalchick, Debtors.

Bankruptcy Nos. 91–24182DAS,
91–24183DAS.

United States Bankruptcy Court,
E.D. Pennsylvania.

Dec. 14, 1994.

Joseph A. Torregrossa, Morgan, Lewis & Bockius, Philadelphia, PA, Court-appointed mediator.

David F. Dunn, Allentown, PA, for debtors.

Vincent J. Presto, Geoffrey R. Johnson, Charles J. Hardy, Sprague & Sprague, Philadelphia, PA, for R/S Financial Corp.

William P. Carlucci, Williamsport, PA, for Com. Bank.

Frederic Baker, Asst. U.S. Trustee, Philadelphia, PA.

### OPINION

DAVID A. SCHOLL, Chief Judge.

### A. INTRODUCTION

The posture of the above-captioned individual Chapter 11 cases of two brothers and their respective wives is unusual and is explained by the fact that the matter was reassigned to this judge in the midst of a plan-confirmation process which the predecessor judge had apparently determined should occur prior to the court's trying (1) underlying adversary proceedings brought against certain common creditor with a long-standing dispute against several members of the Debtors' family; and (2) objections to that creditor's claims by the Debtors. After a report from a mediator assigned through our court's newly-established mediation process that no global resolution of the parties' difference could be reached at this time, which this court hoped would short-circuit a potentially complex decision-making process, we are compelled to pick up and decide the two motions presently before us. Deciding these motions will settle certain issues between the parties which pervade the aforementioned adversary proceedings and objections to the creditor's claims. Our Order accompanying this decision will also schedule a status hearing on December 22, 1994, to determine the next appropriate steps in the resolution process.

The first two motions before us seek the preemptory disallowance of the ballots which it is anticipated that R/S Financial Corporation ("R/S"), a large judgment creditor of both Debtors, will file rejecting the Debtors' respective plans ("the Ballot Motions"). The second two motions ask us to estimate the claims of R/S in each case for the purposes of plan voting ("the Valuation Motions"). At the heart of all of these motions is the parties' ongoing dispute over the validity of R/S's State Court Judgments against the Debtors ("the Judgments") and ownership of the Debtors' respective residences.

We first consider whether we are bound by the results of very significant fact-determinations made by the State Court in entering the Judgments, under the doctrine of collateral estoppel, and conclude that we are. Given this conclusion, certain issues drop out of these disputes, allowing us to fairly easily dispose of the merits of the motions before us. First, we find that the Debtors have not articulated any grounds which would warrant the disallowance of any votes cast by R/S rejecting the Debtors' plans. Second, we value, for plan voting purposes only, R/S's secured claims in each of the Debtors' bankruptcy cases at amounts close to the most recent and most reliable valuation figures presented at trial, and classify the balances of R/S's total claims of $1,617,564.48 as unsecured. We note that the latter exercise is largely academic, given that both R/S's secured and unsecured claims are separately classified in each of the Debtors' plans, and, therefore, the exact amount of each claim (unless that amount happened to be zero) would not affect in any way the acceptance or rejection of those classes. However, we also recognize that the decision of the issues in question was necessary before the Debtors could realistically formulate plans. Whether the parties want to resume the confirmation process, the mediation process, or complete various litigation proceedings generated in

these cases over the years will be determined at the aforementioned status hearing.

## B. FACTUAL AND PROCEDURAL HISTORY

The present state of affairs has a much too long and somber history, dating back to 1977. We repeat that history here, at some length, as a necessary backdrop to our decision and to put the other matters remaining before us in proper context. In August 1977, R/S filed a law suit in the Court of Common Pleas for Schuylkill County ("the State Court"), against Anthony, Sr., and Helen Kovalchick, the parents of Peter and Michael Kovalchick ("the Parents"). The basis of this suit was a controversy which arose in conjunction with a sale/lease transaction of certain mining equipment. Although the facts of this dispute have thankfully not been presented to us by any party, the controversy apparently centered around alleged fraudulent misrepresentations of the Parents in selling the mining equipment to R/S, who in turn leased the equipment to a third party ("the Lessee"). Essentially, R/S claimed that the equipment was not in good working order as promised, nor was the contemplated mining operation feasible, despite the Parents' alleged assurances to the contrary. Also, R/S claimed that the Parents, with the aid of the Lessee, inflated the value (and therefore, the sale price) of the mining equipment, and "kicked back" some of the excess sale price to the Lessee. The Parents filed an answer denying the allegations of R/S's complaint, thus beginning long and hotly contested litigation which spawned the instant disputes.

Shortly before R/S filed its law suit against the Parents, but after the controversy erupted, the Parents divided their land located in New Ringgold, Schuylkill County, Pa. ("the Property"), and transferred several of the lots to their children and children-in-law, including Peter Kovalchick ("Peter") and his wife Donna–Lyn (collectively "P & D") and Michael Kovalchick ("Michael") and his wife Cathy ("Cathy", with Michael, "M & C") (together P & C and M & C are referenced as "the Debtors"). The Debtors paid only nominal consideration for their subdivisions of the Property. Each couple constructed a home on their respective lot within a few years after the Property transfer.

On May 20, 1982, a jury verdict in the amount of $1,436,489.49 was entered in favor of R/S and against the Parents. On November 18, 1983, the Property apparently was sold at a sheriff's sale to R/S on a writ of execution arising out of a judgment entered on the verdict. It is clear from the sale advertisement, and the alleged lack of notice to the Debtors, that R/S was unaware of the 1977 transfers of portions of the Property to the Debtors, and sold the entire Property as land belonging to the Parents only. We are unable to determine if either the Parents or the Debtors challenged the sheriff's sale *per se*. R/S claims to have received a sheriff's deed for the entire Property. We therefore assume that the sale was never successfully challenged.

Apparently learning that the Parents' children were living on the Property, R/S filed, on June 1, 1983, interrogatories in garnishment ("the Interrogatories") addressed to all of the transferees of the Property ("the Garnishees"), including the Debtors. The Debtors have raised a question regarding the sufficiency of service of the Interrogatories. Notwithstanding the alleged defects in service, M & C claim that they did timely file answers to the Interrogatories on June 29, 1983, although these answers do not appear on the State Court docket. On August 26, 1983, default judgments in the amount of $1,436,489.49 were entered against each pair of Debtors for failing to answer the Interrogatories ("the Judgments"). The Superior Court of Pennsylvania, upon review of the verdict against the Parents, reduced it to $1,004,831.65, thus reducing the Judgments to that amount.

On September 9, 1983, the Debtors filed a joint *pro se* petition to open the Judgments in the State Court ("the First Petition"). It is the Debtors' contention, perhaps arising from misunderstandings due to their *pro se* status, that the Honorable Donald D. Dolbin of the State Court entered an order opening the Judgments. However, this alleged order does not appear on the State Court's dockets, nor were the Debtors able to produce a copy of it. Instead, we find an order of the Hon-

orable John E. Lavelle of the State Court dated September 28, 1983, directing the parties to proceed on the First Petition in accordance with Pennsylvania Rule of Civil Procedure ("Pa.R.Civ.P.") 209(a). Pa.R.Civ.P. 209(a) requires the petitioner, in this case the Debtors, to proceed by taking depositions on questions of disputed fact once an answer is filed by the respondent. Although the State Court docket reveals that R/S filed an answer to the First Petition on September 27, 1983, we find nothing which suggests that Debtors, whose *pro se* status undoubtedly rendered comprehension of such a responsibility somewhat problematical, complied with Pa.R.Civ.P. 209(a), or further pressed their First Petition before the State Court in any fashion.

On June 18, 1984, R/S filed a petition in the State Court to fix the amount of its deficiency claim against the Parents and the Garnishees ("the Deficiency Proceeding"). In conjunction therewith, the State Court fixed the aggregate value of the Property at $81,100.00, the value of P & D's portion of the Property at $31,520.00, and the value of M & C's portion of the Property at $20,-010.00.

No further activity occurred in the State Court case until May 1988, when R/S sought to revive the Judgments. On July 1, 1988, this time with the aid of counsel, the Debtors filed preliminary objections to the revival which, contrary to applicable state law, attempted to attack the merits of the underlying Judgments, and were, for that reason, overruled by the State Court on November 22, 1988. *See, e.g., PNC Bank, N.A. v. Balsamo,* 430 Pa.Super. 360, 369, 634 A.2d 645, 649 (1993) (the only cognizable defenses to a petition to revive judgment are that the judgment does not exist, has been satisfied, or has been discharged).

This ruling prompted the Debtors to file their second petition to strike or open the Judgments in the State Court on January 5, 1989 ("the Second Petition"). The Second Petition, like the First Petition, raised a number of alleged procedural deficiencies regarding the procurement of the Judgments as grounds to strike or open them. However, the Second Petition was denied and dis-missed by the State Court without explanation in an order dated March 23, 1989. Furthermore, the State Court's order was affirmed by the Superior Court of Pennsylvania in a judgment memorandum dated February 13, 1990. The Superior Court concluded that the Debtors' Second Petition was barred by the doctrine of laches in light of the Debtors' failure to act, without excuse, upon their First Petition for over five and a half years. The Debtors' petition seeking to appeal this decision to the Supreme Court of Pennsylvania was denied on April 1, 1991.

Meanwhile, on or about July 12, 1990, R/S filed an action in the State Court against the Garnishees sounding in ejectment, quiet title, and fraudulent conveyance. The action is premised solely upon the verdict against the Parents and the sheriff's deed allegedly obtained by R/S at the 1983 sheriff's sale of the Property. The parties have not submitted the dockets from this action, nor have they offered any evidence regarding its prosecution and determination. Therefore, we do not know the eventual disposition of this action, if any. We can only assume that it was unsuccessful (or abandoned) because, at some time in 1991, R/S attempted to bring the Property to sheriff's sale once again, this time again based on the Judgments as well as the verdict. This second sale presumably was intended to rectify any deficiencies associated with the prior sale as a result of the previously unknown Property transfers. Although the second sheriff's sale was originally scheduled for October 28, 1991, a date prior to the Debtors' bankruptcy filings, we assume that the second sale was postponed and then stayed by the Debtors' bankruptcies.

On September 11, 1991, the Debtors filed new, affirmative State Court actions attacking the Judgments, again based upon allegations of fraud by R/S in obtaining them ("the Fraud Actions"). In this venture, the Debtors were represented for the first time by David F. Dunn, Esquire, their present counsel in bankruptcy. The facts and theories underlying the Fraud Actions are not totally clear to us. We understand that the Debtors claimed that it was R/S and its principals that were engaged in a "kickback" scheme

with the Lessee, and that certain principals of R/S perjured themselves when testifying in the original law suit in order to deceive the jury by convincing it that R/S was entitled to funds which they had already received or for which they had otherwise accounted.

■ Before the State Court could decide the Fraud Actions, the Debtors filed their respective Chapter 11 bankruptcy cases on November 14, 1991, in the Reading District of this court, presided over by the Honorable Thomas M. Twardowski. The Fraud Actions were removed to the bankruptcy court on December 27, 1991, and thereafter remanded back to the State Court by Judge Twardowski on July 7, 1992. On February 2, 1993, the State Court dismissed all counts of the Fraud Actions, and, in support of its ruling, noted, *inter alia,* that the alleged fraud was intrinsic fraud which can never be the basis for opening a judgment.[1] The State Court was affirmed by the Superior Court in an opinion dated November 19, 1993, which incorporated verbatim the State Court opinion, including that portion discussing the intrinsic fraud issue. The Debtors filed a petition for further appeal to the Pennsylvania Supreme Court which has yet to be decided.

Shortly after the Debtors filed the Fraud Actions, they also filed a third petition to strike or open the Judgments on October 7, 1991 ("the Third Petition"). R/S filed an answer and motion to strike the Third Petition on November 6, 1991. On November 14, 1991, the State Court entered an order striking the Third Petition noting that "the validity of the original and the revival judgments in this action was fully litigated and decided

in favor of [R/S] in this Court and the judgments of this Court were affirmed on appeal...."

While engaged in these various State Court proceedings, the Debtors formed a second front in their war with R/S, this time drawing battle lines in this bankruptcy court. On February 10, 1992, and February 11, 1992, the Debtors filed virtually identical adversary proceedings against R/S in Adversary Nos. 92–2055, arising out of M & C's case ("No. 2055"), and 92–2067, arising out of P & D's case ("No. 2067") (collectively No. 2055 and No. 2067 are referenced as "the Proceedings"). The Proceedings assert three counts: (I) an attack on R/S's respective proofs of claim, filed in each case as apparently wholly secured in the amount of $1,617,564.48 (consisting of the $1,004,831.65 judgment plus statutory pre-petition interest), contending that these claims were either totally invalid or partially unsecured; (II) a request for removal of the respective Fraud Actions to this court; and (III) damages in these Fraud Actions upon their removal.

As noted above, on July 7, 1992, Judge Twardowski entered an Order striking Counts II and III in No. 2067. Although no like order appears on the No. 2055 docket, this is obviously an oversight. The Fraud Actions thereafter proceeded in State Court, as noted at page 868 *supra.* The main event in what remains of the Proceedings have been motions to compel discovery filed by the respective Debtors against R/S on September 24, 1993, and voluminous responses thereto. This discovery motion has never been resolved, nor were the Proceedings set

---

1. Intrinsic fraud is fraud which pertains to the issues involved in the original action and is most often accomplished through perjury or the submission of forged or altered documents into evidence. Extrinsic fraud is fraud which is collateral to the issues tried, such as when a party secures a default judgment after falsely certifying that it has served the defendant with the complaint. The State Court correctly held that Pennsylvania courts will not set aside a judgment upon an allegation of intrinsic fraud. *See, e.g., Greiner v. Brubaker,* 151 Pa.Super. 515, 521–22, 30 A.2d 621, 624, *cert. denied,* 320 U.S. 742, 64 S.Ct. 42, 88 L.Ed. 440 (1943) ("The rule that judgments and decrees that have been adjudicated after a full hearing in court, without appeal, will not be opened for intrinsic fraud—as distin-

guished from extrinsic fraud—is in force in Pennsylvania; and perjury on such trial or hearing is intrinsic fraud."). *Accord, Panza v. Armco Steel Corp.,* 208 F.Supp. 50, 54 (W.D.Pa.1962), *aff'd,* 316 F.2d 69 (3d Cir.), *cert. denied,* 375 U.S. 897, 84 S.Ct. 174, 11 L.Ed.2d 125 (1963). *But see Hohensee v. Grier,* 373 F.Supp. 1358, 1364–65 (M.D.Pa.1974), *aff'd,* 524 F.2d 1403 (3d Cir. 1975), *cert. denied,* 426 U.S. 940, 96 S.Ct. 2659, 49 L.Ed.2d 392 (1976) (recognizing that even Supreme Court opinions seem to disagree on the issue of whether perjured testimony may be grounds for invalidating a judgment, the court asserts that the Third Circuit is "in the vanguard in settling on the principle that perjury could be the basis for equitable relief from judgments").

for trial, apparently because Judge Twardowski believed that the issues raised therein should be resolved in the plan confirmation process. Unfortunately, that process, too, became bogged down at an early stage.

The Debtors filed their initial Plans and Disclosure Statements on March 10, 1992. On April 30, 1992, R/S filed voluminous Objections to the Disclosure Statements, asserting inadequacies of disclosures and protests of its treatment, which it claimed was inconsistent with the results of the State Court litigation. The Debtors countered by filing Objections to R/S's proofs of claims on June 4, 1992 ("the Objections"). The substance of the Objections was that the underlying Judgments on which they were based were invalid, or were improperly calculated. On August 28, 1992, R/S filed a motion to dismiss these cases or to obtain relief from the automatic stay to pursue the Judgments.

Throughout the balance of 1992, continuing through 1993 and into early 1994, all of the foregoing matters were, consistent with Judge Twardowski's apparent view that all of these disputes and the Proceedings could be resolved in the plan-confirmation process, continued repeatedly while the Debtors filed a series of Amended Plans and Disclosure Statements seeking to overcome R/S' Objections to the Disclosure Statements. In the course of this process, on March 17, 1994, the Debtors filed the Motions to Designate (Ballot) seeking to entirely disallow R/S from voting on the Plans which are the Ballot Motions presently before us.

On April 15, 1994, after a hearing on the latest Disclosure Statements submitted by the Debtors, Judge Twardowski executed proposed Orders submitted by R/S which, *inter alia*, required the Debtors to file, within thirty (30) days, Amended Disclosure Statements, containing, *inter alia*, accountings since the filing of these cases on November 14, 1991, to the present, supported by detailed documentation, of every transaction among the Debtors, other family members,

and K & M Land Developers, Inc., a related corporate debtor which filed Bankr. No. 93–22135 on July 15, 1993 ("K & M"),[2] or suffer dismissal or conversion of their cases to Chapter 7. These Orders prompted a Motion by Anthony Kovalchick, Jr. ("the Brother"), a non-debtor, to file a *pro se* motion seeking to intervene in this case and file numerous pleadings therein, including an initial attempt to have Judge Twardowski recuse himself.

Shortly thereafter, Judge Twardowski was obliged to take an extended medical leave of absence, and this court, sitting temporarily with other judges of this court in the Reading District, presided over a hearing on, *inter alia*, the Brother's motion to intervene and advance his various pleadings. The intervention motion was denied by us in an Order of June 7, 1994, since we found that the Brother's interests were adequately represented by the Debtors and the presence of his voluminous *pro se* filings would be likely to further delay disposition of these cases, citing *In re Ionosphere Clubs, Inc.*, 101 B.R. 844, 849–51 (Bankr.S.D.N.Y.1989); *In re Public Service of N.H.*, 88 B.R. 546, 550–52 (Bankr. D.N.H.1988); and *In re Hyde Park Partnership*, 73 B.R. 194, 196–97 (Bankr.N.D.Ohio 1986). This Order was affirmed in C.A. No. 94–4256 on November 14, 1994. The hearing on the Debtors' Amended Disclosure Statements in response to Judge Twardowski's April 15, 1994, Orders were relisted before him, after his return to the bench, on July 12, 1994.

On June 30, 1994, the Debtors filed virtually identical Motions to Value (Estimate) Claim of R/S Financial Corp. for Plan Voting Purposes, the Valuation Motions before us. After a brief hearing on the various matters at issue and Motions of the United States Trustee to dismiss or convert these cases to Chapter 7 on July 12, 1994, after which all matters were taken under advisement by Judge Twardowski, the Debtors, on August 8, 1994, filed motions seeking modification of

---

**2.** K & M's plan appears poised for confirmation on December 21, 1994. The only possible impediment are the efforts of Peter, the principal of K & M, to disavow a settlement with Commonwealth Bank which is an integral part of the plan. This posture of Peter may represent the same sort of schizophrenic reaction to the legal system which placed the Debtors in such a bad position in State Court.

the April 15, 1994, Orders and the recusal of Judge Twardowski.

On August 22, 1994, this court, although finding the recusal motions without merit, acted in our capacity as chief judge pursuant to 28 U.S.C. § 154(b), and reassigned these cases and the K & M Case to the Philadelphia District and, particularly, this court. After a status hearing of August 25, 1994, we entered an Order indicating that we would convert P & D's case to Chapter 7 on the United States Trustee's motion if they failed to file Operating Statements by September 2, 1994, and providing as follows in reference to M & C's case: (1) reconsideration of the specific strictures in the April 15, 1994, Order regarding the contents of their Disclosure Statement, and a requirement of the submission of a new Disclosure Statement along the lines dictated by this court at the conference, by September 16, 1994; (2) a directive that R/S answer the Ballot Motion and the Valuation Motion in this case by September 16, 1994; and (3) a hearing on the further Amended Disclosure Statement, the Ballot Motion, and the Valuation Motion, and a status hearing on the Debtors' Objections to R/S's claim, No. 2055, and any other matters raised by the parties relative to this case, at a date ultimately fixed as September 30, 1994. Upon P & D's submission of their Operating Statements on September 2, 1994, we extended the terms of the August 26, 1994, Order relating to M & C's case to P & D's case as well.

After the hearing of September 30, 1994, it became apparent to the court that mediation of this dispute would be preferable to attempting to sort out these now tangled cases and render appropriate decisions under the law. We therefore urged the parties to both voluntarily agree to submit their differences to mediation under a General Order of April 15, 1994, establishing a mediation procedure in this court, effective July 1, 1994. Although R/S expressed some opposition, after the court's directive ordering mediation, R/S cooperated with the Debtors in ultimately selecting Joseph A. Torregrossa, Esquire, as

mediator ("the Mediator"), and we officially appointed the Mediator on October 11, 1994.

Our Order of September 30, 1994, also called for the parties to file Briefs in support of their positions on the Motions and for the Debtors to submit new proposed Amended Disclosure Statements incorporating the changes which this court considered appropriate by October 14, 1994. Although no further Amended Disclosure Statements ever materialized, we recognize that our within decision will probably require further amendments in any event, and we therefore shall go forward from this point. Unfortunately, on December 2, 1994, the Mediator advised this court that no agreement could be reached among the parties at this time, although he was prepared to revisit the mediation process after this court rendered this decision and perhaps further decisions on other outstanding matters.

By way of further explanation of precisely what is before us at this time, we observe that the Debtors' virtually identical Plans of Reorganization, as originally conceived and as appearing in their latest form, filed on September 16, 1994, and styled as Third Amended Plans of Reorganization ("the Plans"), anticipate that the R/S Judgments, if valid, may be undersecured, and therefore provide for both the potentially secured and unsecured portions of the R/S claims, as fixed by this court. R/S's potential secured and undersecured claims are then separately classified in their own classes, which are identified in the Plans as class 8A and class 9A respectively.[3] The Debtors do not rule out the possibility that the R/S claims may be disallowed in their entirety, and the Plans provide for this contingency as well.

With respect to the Ballot Motions before us, the Debtors allege the following as evidence that any ballots of R/S on the Plans will be filed in bad faith:

the inherent and on going contradictions by [R/S] in the characterization of its claim, . . . the persistent and captious re-

---

3. Although not clearly stated in either the Plans or the Disclosure Statements, it appears that the Debtors may place at least one other disputed secured claim in class 8A. Other than R/S's

unsecured claim, however, the Debtors do not appear to contemplate the classification any other disputed unsecured claims in class 9A.

fusal [of R/S] to participate either in the claim judication [sic] process or the production of a usable disclosure statement, [and R/S's] blatant declaration that its only purpose before the Bankruptcy Court is to have the debtors [sic] case dismissed and to sell their home—or is it [R/S's] home [sic]—by legal process in Schuylkill County. . . .

R/S responded to the Ballot Motions on July 14, 1994.

With respect to the Valuation Motions, the Debtors' requested, perhaps not surprisingly, that we value R/S's secured claims at zero, or in the alternative, in the amount determined by the State Court in the Deficiency Proceeding. R/S answered the Valuation Motions on September 23, 1994, and, on September 28, 1994, further filed motions in limine, presumably in connection with the Valuation Motions ("the In Limine Motions"). R/S argues, in the In Limine Motions, that the Judgments have become final, and that res judicata, collateral estoppel, and full faith and credit prevent us from disallowing the Judgments in part or full for plan voting purposes or otherwise. Furthermore, when estimating the secured portion of its claim, R/S argues that we should rely on its 1993 appraisal reports and not the findings of the State Court in conjunction with the 1983 Deficiency Proceeding.

At the hearing on September 30, 1994, the Debtors elicited testimony from three witnesses: a process server, to illustrate Debtors substantial but unsuccessful attempts to serve subpoenas on R/S's agents and principals; Michael, who supplied the bulk of the testimony; and Cathy, to verify her husband's testimony. R/S did not bring any witnesses to the hearing. Both the Debtors and R/S entered various documents into the record, which are mentioned, where relevant, in the following Discussion.

### C. DISCUSSION

1. *The State Court Judgments Are Final and Therefore Cannot Be Overturned or Otherwise Modified by This Bankruptcy Court.*

■ The relief requested by the Debtors in the two motions before us, as well as in other matters pending before this court, is justified in large part, per the Debtors, by the facts and circumstances underlying, and giving rise to, the Judgments. Thus we are asked to revisit those facts, and to test the validity of the Judgments themselves. Of course, if the Judgments are unassailable and binding at this point in time, as asserted by R/S, most, if not all, of the Debtors' various motions and proceedings will be gutted of much of their substance. Therefore, we carefully consider the preclusion issues raised in the In Limine Motion first.

■ It is hornbook law that, once a state court judgment becomes final and is no longer subject to appeal, it may not be collaterally attacked by the parties in subsequent litigation, either in the state court or in a federal court. *Moeller v. Washington County,* 352 Pa. 640, 644, 44 A.2d 252, 254 (1945) ("It is an established principle of law, hardly requiring citation of authority, that a judgment, order or decree rendered by a court having jurisdiction of the parties and the subject matter, unless reversed or annulled in some proper proceeding, is not open to collateral attack in any other proceeding."). *Accord, e.g., Vanderveer v. Erie Malleable Iron Co.,* 238 F.2d 510, 512–13 (3d Cir.1956), *cert. denied,* 353 U.S. 937, 77 S.Ct. 815, 1 L.Ed.2d 760 (1957); *Markus v. Dillinger,* 191 F.Supp. 732, 735 (E.D.Pa.1961); and *Miners Savings Bank of Pittston v. United States,* 110 F.Supp. 563, 568 (M.D.Pa.1953). *See also In re Estate of Tower,* 463 Pa. 93, 101, 343 A.2d 671, 675 (1975) (once judgment is final it cannot be collaterally attacked even if mistakes were made in the original proceeding); and *Miller v. Wayne Title & Trust Co.,* 154 Pa.Super. 329, 336, 35 A.2d 786, 789 (1944) (in the absence of an appeal, parties to a prior proceeding are bound by the result therein notwithstanding the commission of error).

The Judgments at issue have withstood the Debtors' many Petitions to strike or open, even at the final level of appeal to the Pennsylvania Supreme Court. *See Schlichtman v. Crawford,* 337 Pa. 497, 499–500, 12 A.2d 52, 53–54 (1940) (prior discharge of petition to open was res judicata of the same matter raised in a subsequent action). The Judg-

ments are therefore now clearly final. The Debtors can no longer attack them directly on procedural grounds, or indirectly by relitigating the merits of the original suit against the Parents. Consequently, in the absence of fraud, the Judgments are binding on this court. *See In re Highway Truck Drivers & Helpers Local Union # 107*, 888 F.2d 293, 299 (3d Cir.1989) ("[A] valid state court judgment cannot be enjoined or otherwise upset by a federal court on grounds that would not be available in the state court."). *Accord, Vanderveer, supra*, 238 F.2d at 512–13; *In re Pennsylvania Truck Lines, Inc.*, 1994 WL 247348, slip op. at *1 (Bankr.E.D.Pa. June 1, 1994); and *In re Garafano*, 99 B.R. 624, 629–30 (Bankr.E.D.Pa.1989).

■ Res judicata, or claim preclusion, prevents a party from re-litigating a matter which has already been considered on the merits and finally decided. Collateral estoppel, or issue preclusion, prevents a party from re-litigating a discrete issue in a subsequent proceeding when that same issue has already been litigated and resolved in a prior suit. *See, e.g., Gregory v. Chehi*, 843 F.2d 111, 116 (3d Cir.1988); and *In re Levitt*, 18 B.R. 598, 601 (Bankr.E.D.Pa.1982). Although it fairly can be argued that the Debtors are using their Ballot Motions and Valuation Motions as nothing more than alternative means of attacking the validity of the Judgments, the fact remains that the Debtors could not have challenged or limited R/S's right to vote on the Plans, nor determined how much of R/S's claims are properly classified as secured, in the State Court. Thus, the motions now before the court are not identical to the many State Court proceedings concerning the Judgments. Collateral estoppel is therefore the only relevant doctrine to consider under these circumstances.

■ The doctrine of collateral estoppel will prevent a party from litigating an issue when (1) the issue is identical to one decided in a prior adjudication; (2) there was a final judgment on the merits in the prior adjudication; (3) the determination of the issue was essential to the final judgment; and (4) the party against whom collateral estoppel is asserted was a party to the prior adjudication

and had a full and fair opportunity to litigate the issue in question in the prior adjudication. *See, e.g., Schroeder v. Acceleration Life Insurance Co.*, 972 F.2d 41, 45 (3d Cir.1992); *Vanderveer, supra*, 238 F.2d at 512–13; *In re Bergman*, 103 B.R. 660, 663 (Bankr.E.D.Pa. 1989); *Levitt, supra*, 18 B.R. at 601; *In re Meade Land & Development Co., Inc.*, 1 B.R. 279, 283 (Bankr.E.D.Pa.1979); and *In re Estate of Ellis*, 460 Pa. 281, 287, 333 A.2d 728, 731 (1975). Many of the issues raised by the Debtors in their Ballot Motions and Valuation Motions are identical to the issues raised by the Debtors in their many Petitions to strike or open the Judgments. Certainly the doctrine of collateral estoppel prevents the Debtors from again challenging the validity of the Judgments in this court.

■ Before we can move on from this threshold inquiry, however, we must consider Debtors' contention that the Judgments were obtained by fraud. Notwithstanding the doctrines of res judicata and collateral estoppel, this court may not be bound by judgments secured by fraud or entered by courts proven to have been without proper jurisdiction. *See, e.g., Pepper v. Litton*, 308 U.S. 295, 305–06, 60 S.Ct. 238, 244–45, 84 L.Ed. 281 (1939) (bankruptcy court may rely on its equitable powers to disallow or subordinate a judgement procured by fraud); *Miners Savings Bank, supra*, 110 F.Supp. at 568 (attacking a final judgment on the grounds of fraud or collusion is "an exception to the rule" that a final judgment may not be collaterally attacked); *Garafano, supra*, 99 B.R. at 630–31 ("[T]he bankruptcy court is not bound by a prior judgment which is rendered by a court lacking proper jurisdiction over the parties or subject matter, or where the judgment was obtained by collusion or fraud."); *In re Fazio*, 41 B.R. 865, 867 (Bankr.E.D.Pa.1984) ("Where a creditor's claim is predicated on a state court judgment, the claim may be attacked as invalid in the Bankruptcy Court on the grounds that the court rendering the judgment did not have jurisdiction over the parties or subject matter of the suit or that the judgment is a product of fraud, collusion or duress."); and *Howell v. Franke*, 393 Pa. 440, 442, 143 A.2d 10, 11 (1958) ("When the parties to an action contrive by the entry of

judgment therein to defeat the rights of a third person in real estate, the judgment does not act as a bar against the claim of the person defrauded, and is therefore subject to collateral attack."). However, when the allegations of fraud have themselves been considered and been found unpersuasive by a court of proper jurisdiction, then that finding is likewise binding on this court.

█ The Debtors have challenged the Judgments without success in State Court, on the basis of the intrinsic fraud, *see* page 868 n. 1 *supra,* allegedly perpetrated by a principal of R/S during the original suit against the Parents. The State Court's dismissal of this attack has been affirmed by the Superior Court and a petition for further appeal to the Supreme Court of Pennsylvania is now pending. It is not clear from the relevant Pennsylvania state law whether the pendency of a petition for further appeal prevents the fraud decision from becoming final for res judicata/collateral estoppel purposes. *Compare Bryar v. Campbell,* 177 U.S. 649, 654, 20 S.Ct. 794, 796, 44 L.Ed. 926 (1900); *Roodveldt v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 585 F.Supp. 770, 776 (E.D.Pa.1984); *United States v. Employers Mutual Liability Insurance Co.,* 495 F.Supp. 840, 842 (W.D.Pa.1980); and *Columbia Nat'l Bank v. Dunn,* 207 Pa. 548, 550, 56 A. 1087, 1088 (1904) (all holding that, under Pennsylvania law, a judgment is not final for res judicata or collateral estoppel purposes while an appeal of that judgment is pending), *with Kellner v. Aetna Casualty & Surety Co.,* 605 F.Supp. 326, 330 (M.D.Pa.1984); *Commercial Union Assurance Co. v. Pucci,* 523 F.Supp. 1310, 1318 (W.D.Pa.1981); *Meade Land, supra,* 1 B.R. at 283; *Federal Land Bank of Baltimore v. Putnam,* 350 Pa. 533, 538, 39 A.2d 586, 588 (1944), *cert. denied,* 324 U.S. 882, 65 S.Ct. 1026, 89 L.Ed. 1433 (1945); and *In re Wallace's Estate,* 316 Pa. 148, 153, 174 A. 397, 399 (1934) (all holding that under Pennsylvania law, a judgment is final for res

judicata and collateral estoppel purposes until reversed).

Even if we assume that a pending appeal prevents the operation of collateral estoppel or res judicata, we think a mere *request* for further appellate review which has not yet been granted is not the same as a pending appeal as of right, and would not a prevent a lower court's decisions on the fraud issue from becoming final for res judicata and collateral estoppel purposes. *Cf. Pennsylvania Truck Lines, supra,* slip op. at *1 (pendency of post-trial motions does not affect the finality of a judgment, citing RESTATEMENT (SECOND) OF JUDGMENTS, § 13, com. f, at 135 (1983)).

In any event, the Debtors have submitted little coherent evidence on the fraud issue. Therefore, they have failed to meet their rigorous burden of proving fraud by clear and convincing evidence.[4] *See Miners Savings Bank, supra,* 110 F.Supp. at 568 ("Fraud is never presumed; he who avers it has the burden of proving it ... by clear and convincing proof."). *See also Hohensee, supra,* 373 F.Supp. at 1364–65 (unsupported and conclusory statements that judgements were obtained by fraud were insufficient to prevent the application of res judicata). We also fail to see what could be produced on an expanded record which could convince us that the instant Judgments could be successfully attacked, and the Debtors have not suggested what such evidence might be.

2. *Nevertheless, There is Considerable Doubt as to Whether R/S Owns the Debtors' Properties at Present.*

█ Before we can consider the merits of the Motions before us, and even in light of our conclusion that the Judgments in issue are not subject to attack, we are nevertheless faced with another very significant preliminary question, namely, do the Debtors even

---

**4.** The Debtors may attempt to attribute this failure of proof on the alleged refusal of R/S's principals to accept service of Debtors' subpoenas designed to compel their appearance at the September 30 hearing, per the testimony of the process server. In light of his testimony, we observe that the process server made a considerable effort to serve subpoenas on these parties. Howev-

er, the Debtors did not file a motion to compel the appearance of witnesses before the hearing, and only complained of the principals' alleged evasion of the subpoenas at the hearing on the motions. Their complaint came too late. More importantly, they failed to explain what testimony they expected to elicit and how that testimony would have benefitted their cause.

own "their" Properties in issue? As noted above, it appears that R/S received a sheriff's deed to the entire Property as a result of the first sheriff's sale. Despite the alleged facial irregularities of that sale, no one has asserted that the sale was overturned or that the sheriff's deed was ever ruled void.

However, the Debtors have accurately observed that R/S, at times, has claimed an ownership interest in the Property, including their own properties, while at other times it has claimed that it has only a lien interest in their respective properties. We do not agree with the Debtors that this conduct of R/S evidences an intention on its part to deceive this court or the State Court. Rather, we think these differences in expression of its interests in their properties is a result of R/S's struggles to supplement or rectify the perceived deficiencies of its initial steps in the State Court, which were taken in ignorance of the Property transfers. Of course, the Debtors (and certainly the Parents), by possibly engaging in fraudulent conveyances, are not without blame for the resulting quagmire. Nevertheless, this state of affairs is indicative of certain significant procedural irregularities below which have complicated subsequent proceedings including the proceedings in this court.

Clearly, R/S did not believe that it held good title to the Property as a result of the 1983 sheriff's sale or it would not have done the following *after* that sale: (1) served the Interrogatories on the Debtors and secured Judgments against them individually; and (2) revived the Judgments and scheduled a second sheriff's sale of their interests in their properties in 1991. In any event, R/S has never clearly taken the position in this court that it owns the Property, nor did it make any effort to prove that it holds absolute title to the Property at the September 30 hearing.

■ We note that, in Pennsylvania, obtaining a judgment alone does not give rise to a lien on the judgment debtor's real property until the judgment is recorded in the county office where land records are maintained. *See* 20A P.L.E. *Judgments*, § 313, 239 (1990). In proceedings such as those now before this court, once the debtor challenges the judgment creditor's lien, it is incumbent upon the creditor to prove the validity of its lien. *Cf. In re Railroad Dynamics, Inc.*, 97 B.R. 239, 244–45 (Bankr.E.D.Pa. 1989) (creditor failed to establish that its judgment was secured by the debtor's personal property once the trustee met its burden of contesting prima facie validity of creditor's secured claim); and *Pennsylvania Truck Lines, supra,* slip op. at *2 (even though the judgment of a creditor cannot be collaterally attacked by the debtor, the claimant has the burden of establishing that the judgment was recorded in the jurisdiction in which the debtor had realty to sustain its secured status). In this case, R/S has offered no evidence that its Judgments are properly recorded. On the other hand, the Debtors, though not shy about litigation of any issues conceivably available to them, have not challenged R/S's lien and have even tacitly acknowledged them in arguing only that the Judgments themselves, from which the liens arise, are invalid.

From all of the foregoing, we see ample indicia that R/S holds only claims against the Debtors, and does not own their properties. Without any firm State Court directive to support their position of ownership, we would be strongly inclined to conclude that the Debtors own their properties, subject to the claims and liens of R/S.

3. *The Debtors Have Not Shown That Any Ballots of R/S Will Be Filed in Bad Faith, Such as to Support the Ballot Motions.*

■ As we noted above, the Debtors' rather unorthodox Ballot Motions were filed before the Plan voting processes have even commenced. There is authority for the proposition that a bankruptcy court may nonetheless decide such preemptory motions, although there is not unanimity on the issue. *Compare In re Pleasant Hill Partners, L.P.*, 163 B.R. 388, 389 (Bankr.N.D.Ga.1994) (preemptory motion to disallow ballot considered), *with In re A.D.W., Inc.*, 90 B.R. 645, 647 (Bankr.D.N.J.1988) (preemptory motion to disallow ballot not considered). Because we will deny the Ballot Motions in any event, we will address their merits at this juncture.

■ As a general rule, a ballot reflecting a vote of a creditor on a Chapter 11 plan will only be disallowed as potentially having been cast in bad faith if the voting claimant (1) is using "obstructive tactics and hold-up techniques" to extract better treatment for its claim as opposed to other similarly situated claim holders in the same class; (2) cast its vote "for the ulterior purpose of securing some advantage to which the creditor would not otherwise have been entitled;" or (3) when the motivation behind the vote is not one consistent with a creditor's protection of its self-interest. *See, e.g., In re Federal Support Co.*, 859 F.2d 17, 19–20 (4th Cir.1988); *In re Marin Town Center*, 142 B.R. 374, 378–79 (N.D.Cal.1992); *In re Holly Knoll Partnership*, 167 B.R. 381, 385 (Bankr.E.D.Pa. 1994); *Pleasant Hill, supra*, 163 B.R. at 393; *In re Lloyd McKee Motors, Inc.*, 157 B.R. 487, 488–89 (Bankr.D.N.M.1993); *In re Landing Associates, Ltd.*, 157 B.R. 791, 802–03 (Bankr.W.D.Tex.1993); *In re Gilbert*, 104 B.R. 206, 215–16 (Bankr.W.D.Mo.1989); *A.D.W., supra*, 90 B.R. at 648–49; and *In re Landau Boat Co.*, 8 B.R. 432, 434–35 (Bankr. W.D.Mo.1981). The burden on a party seeking to have a ballot disallowed is heavy. *See Pleasant Hill, supra*, 163 B.R. at 393.

■ The requisite bad faith will not necessarily be found to be present simply because the creditor casting the vote in question (1) was motivated by self-interest; (2) has no desire to see the debtor reorganize; (3) believes that acceptance or rejection of the plan, as the case may be, will not maximize payment of its claim; or (4) does so in order to utilize its blocking position. *See, e.g., Federal Support, supra*, 859 F.2d at 19–20; *Marin Town, supra*, 142 B.R. at 379; *Holly Knoll, supra*, 167 B.R. at 385; *Pleasant Hill, supra*, 163 B.R. at 393–95; *Lloyd McKee, supra*, 157 B.R. at 489; *Landing Associates, supra*, 157 B.R. at 807–09; *In re First Humanics Corp.*, 124 B.R. 87, 92 (Bankr.W.D.Mo.1991); *Gilbert, supra*, 104 B.R. at 216; *A.D.W., supra*, 90 B.R. at 649; and *Landau Boat, supra*, 8 B.R. at 435–36. On the other hand, seeking to take control of the debtor or attempting to use the plan process to crush competition, whether that competition be the debtor or a fellow creditor, may constitute a bad faith motivation.

*See, e.g., Landing Associates, supra*, 157 B.R. at 807; *Gilbert, supra*, 104 B.R. at 216; and *Landau Boat, supra*, 8 B.R. at 435–36.

Courts have also held that the presence of any of the following circumstances does not necessarily equate with bad faith: (1) pending litigation between the claimant and the debtor; (2) past attempts by claimant to have the debtor's bankruptcy case dismissed; (3) refusal to cooperate with debtor's reorganization efforts; and (4) excessive and expensive litigation with the debtor. *See, e.g., Federal Support, supra*, 859 F.2d at 20 (pending law suit); *Lloyd McKee, supra*, 157 B.R. at 489 (motions to dismiss/convert and pending law suit); *Landing Associates, supra*, 157 B.R. at 804–09 (excessive and expensive litigation and failure to cooperate with reorganization efforts); *A.D.W., supra*, 90 B.R. at 649 (pending law suit); and *Landau Boat, supra*, 8 B.R. at 436 (same).

The Debtors' grounds for seeking disallowance of the ballots of R/S include: (1) R/S's stated objective to have Debtors' bankruptcy cases dismissed so that it might more easily foreclose on the entire Property in State Court; (2) R/S's excessive criticism of the Disclosure Statements and its refusal to participate in the drafting of acceptable Disclosure Statements; (3) excessive litigation, presumably engineered by R/S; (4) defects associated with the Judgments and the underlying verdict; (5) R/S's motions to dismiss containing "phony" allegations; (6) an alleged physical altercation between the Brother and R/S's counsel outside the Reading courtroom on one occasion; (7) R/S's failure to cooperate in Debtors' attempt to investigate the validity of the Judgments and the underlying verdict against the Parents; and (8) R/S's "flip flopping" between claims that it owns the Property and claims that it only holds a lien interest in the Property.

We find that most, if not all, of these grounds, particularly grounds (1), (2), (3), (5), and (8), are analogous to those not found to support disallowance in the cases cited above. Others, relating to the validity of the Judgments, such as grounds (4) and (7), have already been decided against the Debtors and cannot be re-litigated here. The remain-

ing ground (6) is of limited relevance and, as is true of many of the other grounds, was not proven by any evidence at the hearing and therefore remains as a mere unsupported allegation of counsel. Because the Debtors have utterly failed to meet their burden of proof on this issue, the Ballot Motions must be denied.

4. *R/S's Secured And Unsecured Claims Will Be Estimated for Voting Purposes in Conformity with Our Prior Decisions and in Light of R/S's 1993 Appraisals of the Properties.*

■■■ At the outset, we note that R/S, relying on 11 U.S.C. § 502(c), asserts that there is no need to estimate its claims because they are not contingent or unliquidated. However, the Debtors seek to estimate R/S's claims for voting purposes, pursuant to Federal Rule of Bankruptcy Procedure ("F.R.B.P.") 3018(a), and not pursuant to § 502(c). When claims are objected to by a debtor, as is the case here, it is quite proper for the debtor, the claimant, or another party in interest to ask the court to estimate the claim for voting purposes. *See* F.R.B.P. 3018(a); and *In re Goldstein,* 114 B.R. 430, 432–34 (Bankr.E.D.Pa.1990). Indeed, at least one court has held that a claimant who has had its claim objected to has an affirmative duty to file its own F.R.B.P. 3018(a) estimation motion if it wishes to vote on the debtor's plan, *see In re M. Long Arabians,* 103 B.R. 211, 215 (9th Cir. BAP 1989), although we declined to adopt this line of reasoning in *Goldstein, supra,* 114 B.R. at 433–34.

Nevertheless, we are somewhat perplexed by the Debtors' Valuation Motions in the context of their instant Plans. Typically, a debtor will request the court to estimate a claim for voting purposes because the size of the claim may dictate whether the class which contains it will accept or reject a proposed plan. In this case, however, the claims which we are asked to estimate are each placed in their own respective classes. Thus, if the amount of the claims is anything but zero, R/S will dictate whether the classes containing their claims will accept or reject the Plans by the choices it makes when it casts its ballots. Consequently, it makes no sense to us why the Debtors have advocated that we allocate values, albeit low ones, to R/S's secured claims in the alternative to their argument that the claims should be valued at zero. In light of the temporary nature of the valuations at hand, *any* values other than zero has the same effect of placing control of the classes at issue in the hands of R/S and undermining the Debtors' strategy. *See In re Slawek,* 1990 WL 76668, slip op. at *4 (Bankr.E.D.Pa. June 4, 1990). Hence, the parties' heated debate over the size of R/S's secured claim indicates to us that both parties may misunderstand the process or have not carefully reviewed the Plans.

Given our observations above, we recognize the futility of the estimation which Debtors ask us to perform and we are tempted to end our analysis here. However, Debtors did make a weak argument that R/S's claims should be valued at zero. Such a valuation would indeed affect the outcome of voting on the Plans, by effectively disenfranchising R/S. We also noted above the possibility that other claims may yet be classified in the same classes as the R/S claims at issue. *See* page 870 n. 3, *supra.* We will therefore assign values to the secured and unsecured portions of R/S's claims for the purpose of Plan voting only. These estimates, of course, would be superseded by any final valuations of the claims we may be asked to perform if such valuations are completed prior to the voting process. *See* 11 U.S.C. § 506(a).

Although the validity of the Judgments is no longer subject to question, that fact has no bearing on this exercise except to establish the principal amounts of R/S's aggregate claims. *Cf. Pennsylvania Truck Lines, supra,* slip op. at *2; and *In re FRG, Inc.,* 121 B.R. 451, 458 (Bankr.E.D.Pa.1990). Thus, it is incumbent upon R/S, who bears the burden in this regard, to prove the amounts of the secured and unsecured portions of its claims. *See FRG, supra,* 121 B.R. at 456–59. R/S has entered into evidence certain 1993 appraisals of the Debtors' portions of the Property, along with a transcript of the appraiser's testimony given at an earlier hearing before Judge Twardowski. The apprais-

er valued P & D's home at $190,000 based on an exterior inspection only. The appraiser valued M & C's home at $120,000 based on a full inspection, and updated the value to $125,000 based on a subsequent exterior inspection.

We are certain, at least, that R/S's claim is secured in some part by the Debtors' homes notwithstanding the fact that R/S's valuation evidence leaves much to be desired. Notwithstanding their shortcomings, the appraisals, which are supported by comparable sales analyses, appear to be far more reliable than the dated results of the Deficiency Proceeding, in which the State Court was probably unaware that the Debtors had built their homes on their portions of the Property. Therefore, for the purposes of plan voting only, then, in P & D's bankruptcy case, we value R/S's secured claim at a compromise figure of $170,000 and its unsecured claim at $1,447,546.48, the amount of the Judgments plus statutory interest through the petition date, less the $170,000 secured portion of that claim. In M & C's bankruptcy case, we value R/S's secured claim at $120,000, and, through a similar calculation, its unsecured claim at $1,497,546.48.

5. *The Forgoing Rulings, While Made in the Context of the Motions Only, Appear to Affect Most, If Not All, of the Other Matters at Issue in These Cases.*

One reason that this court has gone forward to decide the motions before us, even though they appeared to be relatively insignificant in and of themselves, was our hope that these decisions would give some shape to the ostensibly more significant matters at issue in the Proceedings and the other contested matters before this court in these cases. We believe that this purpose has been fulfilled.

The resolution of the Valuation Motions provides a clear basis of the claims of R/S which are likely to be sustained if the Objections are litigated further. The Debtors may now want to go back to the drawing board as to their general approaches as well as the specifics of their Plans, because they will have some figures with which to work. On the other hand, they should now recognize

that any attempts to invalidate R/S's claims by attacking the State Court Judgments or by measures such as the Ballot Motions must be put aside. They must either work within those realities, or indicate their inability to do so and live with dismissal of their cases or conversions of their cases to Chapter 7 cases.

The Proceedings appear to be virtually doomed to defeat. Only Count I, attacking the Judgments, remained after Judge Twardowski's July 7, 1992, Order. The Judgments have been clearly upheld on the instant record, and it is difficult to conceive of a scenario in which the Debtors could present sufficient additional evidence to alter this result.

It is the hope of the court that this discussion of the most relevant underlying issues will cause the parties to once again seek the benefit of their willing and well-chosen Mediator.

In any event, we will schedule a status hearing just prior to the forthcoming holidays, on December 22, 1994. At this time we would like the parties to indicate whether they wish to attempt further mediation and to advise the court, hopefully after some prehearing discussion among themselves so that they can agree, what matters they desire to address, in what order and in what time frame. We do note that the longevity of these cases causes us to observe that mediation must be conducted simultaneously with litigation and that the time frames must be kept short.

We hope that the new year will bring the parties to a swift resolution of matters which have gone on for entirely too long.

## D. CONCLUSION

An Order consistent with the conclusions reached in this Opinion will be entered.

### ORDER

AND NOW, this 14th day of December, 1994, upon consideration of the virtually identical Motions to Designate (Ballot) ("the Ballot Motions") and Motions to Value (Estimate) Claim of R/S Financial Corp. ("R/S") for Voting Purposes ("the Valuation Motions") filed by the Debtors in the two above

bankruptcy cases, and upon consideration of the record made at a hearing on the Motions conducted on September 30, 1994, and the post-trial briefs and other pleadings filed by the Debtors and R/S relative thereto, it is hereby ORDERED AND DECREED as follows:

1. The Ballot Motions are DENIED.

2. As to the Valuation Motions, in Bankr. No. 91–24182DAS, the secured claim of R/S shall equal, for plan voting only, $170,000, and the unsecured claim of R/S shall equal, again for plan voting only, $1,447,546.48; and, in Bankr. No. 91–24183DAS, the secured claim of R/S shall equal, for plan voting only, $120,000, and the unsecured claim of R/S shall equal, again for plan voting only, $1,497,546.48.

3. A status conference as described in the within Opinion is scheduled in these cases on

THURSDAY, DECEMBER 22, 1994, AT 9:30 A.M. and shall be held in Bankruptcy Courtroom No. 4, Third Floor, United States Court House, 601 Market Street, Philadelphia, PA 19106. This court will not consider any requests to delay this conference, but may advance the date if the parties agree to do so.